**ROBERT BRUCE, INC., Plaintiff,**

v.

**SEARS, ROEBUCK & CO., Defendant.**

**Civ. A. No. 71–2531.**

United States District Court,
E. D. Pennsylvania.

May 19, 1972.

---

Bruce W. Kauffman, Dilworth, Paxson, Kalish, Levy & Coleman, Arthur H. Seidel, Seidel, Gonda & Goldhammer, Philadelphia, Pa., for plaintiff.

Burton Y. Weitzenfeld, Arnstein, Gluck, Weitzenfeld & Minow, Chicago,

Ill., Charles M. Allen, Howson & Howson, Philadelphia, Pa., for defendant.

## OPINION AND ORDER

EDWARD R. BECKER, District Judge.

### I. PRELIMINARY STATEMENT

This is a trademark infringement case.[1] The plaintiff, Robert Bruce, Inc. ("Robert Bruce"), manufactures and sells, *inter alia*, men's and boys' knit shirts, sweaters and swimwear, and owns a United States Trademark Registration, "Grubb", for such goods.[2] In November 1966, Robert Bruce launched a major promotional effort, supported by a large expenditure of funds, to market the "Grubb" line through the 5000 Robert Bruce retail customers throughout the United States. This effort, which has continued until this day, has been highly successful; virtually one-half of the Robert Bruce production and marketing effort is now devoted to the "Grubb" line of merchandise.

The defendant, Sears, Roebuck and Co. ("Sears"), is one of America's largest retail merchandising concerns, with department stores and catalogue outlets throughout the length and breadth of the land. In May 1971, Sears commenced offering jeans for sale under the mark "Neets n Grubs", and when it refused to accede to Robert Bruce's demand that it cease using that mark, this suit followed.

The principal questions before us are: (1) whether the "Grubb" mark is in actuality a mere descriptive mark which is not entitled to trademark protection;

and (2) whether the "Neets n Grubs" mark is confusingly similar to the "Grubb" mark within the meaning of the Lanham Act and the caselaw. The final hearing has been held.[3] As will be seen, we conclude: (1) that the "Grubb" mark is not merely descriptive, but is instead an arbitrary, fanciful and therefore strong mark which is entitled to protection; (2) that "Neets n Grubs" so closely resembles "Grubb" as to be likely to cause confusion or mistake; and (3) that the defendant's use of "Neets n Grubs" constitutes an infringement of the plaintiff's trademark "Grubb". We turn first, however, to a recitation of our findings of fact from which these conclusions stem. This Opinion constitutes our findings of fact and conclusions of law under Fed.R.Civ.P. 52(a).

### II. FINDINGS OF FACT

#### A. *Introduction*

We make the following findings with the awareness that, while the bulk of them relate to statements of subsidiary fact, some of them (*e. g.*, descriptiveness of the mark, likelihood of confusion) are findings of ultimate fact. The findings of ultimate fact have been stated with full cognizance of the legal principles governing such matters (see discussion *infra*).

#### B. *Robert Bruce Goods And The Question Of Descriptiveness Of The "Grubb" Mark*

For the past ten years, Robert Bruce has designed its wearing apparel with a twofold market objective: to appeal to

---

1. The complaint is brought under the Lanham Act, 15 U.S.C. § 1051 et seq., and also on grounds of common law trademark infringement and unfair competition. The latter claims are cognizable within the pendent as well as the diversity jurisdiction of this Court (Robert Bruce is a Pennsylvania corporation and Sears is a New York corporation). *See*, 28 U.S.C. § 1338(b).

2. Robert Bruce registered "Grubb" as Trademark No. 881,745 on December 2,

1969. All parties concede that mere registration on the Principal Register is not conclusive of plaintiff's right to protection. *See*, 15 U.S.C. § 1057(b).

3. While the matter first came before us on Robert Bruce's application for a preliminary injunction, after pre-hearing conference the parties agreed to the merger of the preliminary injunction hearing with final hearing on the merits.

the mature male and to youth.[4] The approach to the former group has been through the so-called Arnold Palmer line; the approach to the latter has evolved through various stages culminating with the creation of the "Grubb" line. Since November 1966, Robert Bruce has continuously used the trademark "Grubb" in commerce on wearing apparel comprising sweaters, knit shirts, swim trunks, and swim tops. In addition, it has from time to time added various "Grubb" trademarked items of apparel which coordinate with its basic "Grubb" shirt and sweater. Such items of apparel include casual full length pants, walking shorts, jackets, scarfs, caps, socks, gloves, hats, beach towels, and (see infra) jeans.

From 1963 until it was phased out in 1967, Robert Bruce had used the trademark "TNT" for its youth line of wearing apparel. However, in 1966, Ronald Stevens ("Stevens"), Robert Bruce's Executive Vice President for Marketing, apprehended that the "TNT" trademark had no appeal to the youth market because of its close association with the word "teen" which had become passé. Since Robert Bruce considers appropriate trademarks to be a vital part of its business,[5] Stevens sought another mark by which Robert Bruce could distinguish its youthful wearing apparel. The mark "Grubb" was arrived at and adopted as the Robert Bruce trademark for its basic line of wearing apparel fashioned for the youth market.

Robert Bruce's "Grubb" trademarked apparel is in the medium to high price category. The firm carefully controls and maintains the quality of its apparel.

There was no change in the quality or style of the "Grubb" wearing apparel from that of the "TNT", except as necessitated by the vagaries of fashion in the youth market; yet sales of youthful apparel have markedly increased steadily every year since the mark "Grubb" was adopted—from in excess of three million, four hundred thousand dollars in 1967 to over twelve million dollars in 1971. Total sales of wearing apparel under the "Grubb" trademark are now well in excess of thirty-six million dollars. In addition, sales of apparel under the "Grubb" trademark amount to between forty-five and fifty percent of Robert Bruce's present total annual sales which are in excess of twenty-five million dollars and have been continually growing.

The youth market to which Robert Bruce sells its "Grubb" trademarked wearing apparel is fashion conscious and there is a tendency toward uniformity of style among peers within that market. The youthful wearer of plaintiff's "Grubb" apparel is also brand conscious. These factors have made the Robert Bruce brand name identification policy (see n. 5) peculiarly apposite, and in pursuit of this policy Robert Bruce has aggressively promoted "Grubb" for its youth line of wearing apparel.[6]

Robert Bruce promotes the sale of its "Grubb" wearing apparel on two levels —one directed to retail customers[7] and the other directed to the consuming public. Promotion of the sale of goods to Robert Bruce retail customers consists of seeking publicity through editorial comment in trade journals and through the extensive publication of attractive

---

4. By the term "youth", Robert Bruce comprehends the age group, roughly speaking, between 16 and 25.

5. Robert Bruce finds itself unable to compete on a purely cost basis with goods from the Far East. Moreover, competitors, both foreign and domestic, can imitate fashion. Robert Bruce has therefore depended for its marketing success upon brand name identification. Robert Bruce uses its various trademarks on all of its advertising and promotional materials and

on all of its hangtags and labels affixed to its goods.

6. Robert Bruce's use of the "Grubb" mark for its wearing apparel has been exclusive.

7. Robert Bruce presently has in excess of thirty-five hundred retail customers for its "Grubb" trademarked wearing apparel. These customers consist almost exclusively of first line department and specialty stores located throughout the 48 continental states.

multicolor brochures in which the "Grubb" wearing apparel is shown. The brochures prominently feature the "Grubb" mark and the "Grubb" line. The brochures are created with the assistance of an advertising agency at various scenic locations. They are published twice a year (approximately six months before the time when the goods will appear on retailers' shelves). Each brochure is published in a trade magazine having a circulation of between thirty and forty thousand and in addition brochures are sent to eight thousand current and prospective retail customers. Still another five thousand brochures are distributed by plaintiff's sales force.

Advertising and promotion directed toward the ultimate consumer consists of packaging (labels, tags, boxes, plastic bags), point of sale pieces, and consumer advertising through radio, television and newspapers as well as advertising mats for use by a retailer in placing an advertisement in a local newspaper. Over and above the cost of preparing the various advertising items which it makes available to its retail customers free of charge or at cost, Robert Bruce also contributes to its retail customers' purchase of newspaper space or TV and radio time. Robert Bruce's contribution is fifty percent of the cost of the space or time up to two percent of the volume of Robert Bruce goods sold by the retailer. In the Spring of 1971, over three hundred retailers played Robert Bruce's radio advertisement featuring "Grubb" and its television advertisement featuring "Grubb" in some nineteen major cities throughout the United States including New Orleans, St. Louis and Philadelphia between fifteen and thirty times over a ten day period.

During 1971, Robert Bruce spent three hundred and eighty-five thousand dollars in promoting the "Grubb" trademark. Since 1967, Robert Bruce has spent one million, four hundred and one thousand dollars promoting its "Grubb" mark. Over forty-percent of the total advertising costs since 1967 (which includes trade, consumer and packaging advertising) has been spent on consumer advertising. We find that by reason of its substantial advertising and promotional efforts, the quality and appeal of the apparel, and extensive sales, Robert Bruce's "Grubb" trademark has become well and favorably known to both plaintiff's retailers and to the purchasing public.[8] Robert Bruce's trademark "Grubb" therefore represents substantial good will and is an asset of great value.

Robert Bruce has incorporated the concept of coordination into its "Grubb" wearing apparel. "Coordination" is the matching of different items of clothing in color and style so that they can be worn together. Its commercial purpose is to stimulate sales by inducing customers to make simultaneous purchases of coordinated items of clothing. Since 1969, Robert Bruce has sold casual pants as a coordinated part of its line of "Grubb" trademarked wearing apparel. In 1970 Robert Bruce became even more aware of the strong market for coordinated tops and bottoms and it therefore commenced looking for a manufacturer which it could acquire so that its entire line of Robert Bruce goods could be coordinated between tops and bottoms.

As the result of the coordination trend, at sometime prior to June 1971, Robert Bruce entered into a contractual arrangement with Casual Slacks, Incorporated and Toby Manufacturing Company relating to the acquisition of a pants manufacturing company known as Shelby. Robert Bruce is now conducting its pants business through Shelby even

8. Three buyers for large stores in Roanoke, Va., Baltimore, Md. and Southeastern Pennsylvania testified concerning their personal experience with the consuming public while actually selling clothes on the floor. Messrs. Levy, Stiller and Reamer all testified that consumers fre-

quently asked for "Grubb" clothes by name, and Mr. Reamer further testified that it was necessary for him to buy the "Grubb" line because of the consumer acceptance of it. The "Grubb" sales figures confirm this finding.

though final approval of the proxy statement for the acquisition agreement by the Securities and Exchange Commission has been delayed. Since June of 1971, Robert Bruce has worked closely with the management of Shelby to develop a coordinated line of tops manufactured by Robert Bruce and bottoms manufactured by Shelby. This has included frequent visits by Robert Bruce management to the Shelby manufacturing facilities, close coordination of selling and supervision and maintenance of quality.[9]

At least as early as June 1971, Robert Bruce decided to include jeans in its "Grubb" wearing apparel line since they were very much in demand as part of the fashion currently being worn by the youth of both sexes. Plaintiff has created a line of jeans and is promoting its sale for Spring 1972. The jeans are being sold under the "Grubb" trademark as shown in plaintiff's Spring 1972 brochure. On November 1, 1971, plaintiff started shipping to its retail customers jeans to be sold during the Christmas Holiday season; these jeans had the "Grubb" trademark affixed to them.

Sweaters, shirts, and casual pants including jeans are sold side-by-side by both plaintiff's retail customers and by defendant to the same class of customers. We find that shirts and sweaters and pants, including jeans, are related goods because, *inter alia*, they are purposely coordinated to be worn together and are often sold simultaneously to the same customer. In addition, plaintiff's retail customers display them side by side in the stores. As will be discussed *infra*, defendant employs the same marketing technique.

The evidence introduced in the case included a large number of garments bearing the "Grubb" mark and numerous advertising brochures depicting the "Grubb" merchandise. The "Grubb" line as a whole is most attractive and stylish. It ranges from a simple and neat, but fashionable basic core to a series of brightly colored whimsically designed, but remarkably handsome, varieties. We note that the jeans which Robert Bruce coordinates with the shirts and sweaters are not sloppy, but rather smart, with good looking colors and stripes and a moddish flair; in this respect, those jeans parallel the other "Grubb" items. All the "Grubb" merchandise appears to be of first quality [10] and the advertising conveys that impression as well.

The word "Grubb" does not appear in Webster's Third New International Dictionary (unabridged). However, the word "grub" does. It is defined as follows:

1. to lend a laborious or a drearily plodding life: tail, drudge

2. an insect

3. a dull unattractive person: drudge

4. a person of grubby or slovenly appearance or of unpleasant or ill-bred manners

5. food, victuals

6. root or stump in ground (verb—to dig for such).

In an attempt to demonstrate that "grub" (as used in "Neets n Grubs", as well as in "Grubb") is a descriptive term, Sears introduced evidence of a series of so-called group interaction sessions devoted to the subject of "How Young People Talk About Jeans". While the transcript of those sessions makes no reference to the term "grub" and scant reference to the term "grubbies".[11] it appeared that the young people involved in the sessions talked of the "grubbies" as meaning faded, old jeans, princi-

---

9. From time to time, Robert Bruce has incorporated men's pants into its line, such as in 1970, when it offered leisure pants. On March 20, 1971, Robert Bruce acquired Shelby in order to be able to market coordinated "Grubb" tops and "Grubb" bottoms.

10. This conclusion was confirmed by Steven's testimony as to the extra care with which the garments were made.

11. Webster defines "grubby" as dirty, shabby or slovenly in appearance.

pally of the blue denim type, donned for casual as opposed to dress wear. Diane Mandt and Peter Schaul, two former teenagers (now college graduates) testified to similar effect.

We agree that the generally accepted meaning of "grubby" is old, faded, dirty, coarse, etc. But in such case, the term "grub" is not only not descriptive of the Robert Bruce "Grubb" merchandise, it is counter-descriptive.[12] The "Grubb" goods are anything but faded, old, and un-dressy. They are to the contrary good looking, fashionable and highly styled, the very antithesis of "grubby". This contradiction in terms was one of the factors motivating the choice of the "Grubb" mark. Stevens testified that the "absurdity" struck him as an attractive feature of the application of the mark to Robert Bruce's goods.

The factors just recited are anticipatory of and ingredients in our ultimate conclusion (see *infra*) that the "Grubb" mark is coined, arbitrary and fanciful. In addition, we note that we do not find the term "grub" to be descriptive of any particular type of goods or merchandise at all. The dictionary definition does not so establish it. The testimony of Miss Mandt and Mr. Schaul does not do so,[13] and neither do the meager results of the group interaction session.[14]

### C. *Sears' Use of the "Neets n Grubs" Mark*

In May 1971, Sears commenced offering jeans for sale under the mark "Neets n Grubs".[15] National advertising of "Neets n Grubs" jeans commenced in August 1971 at which time plaintiff first acquired knowledge that Sears was marketing jeans under the "Neets n Grubs" mark. Sears is extensively advertising the sale of jeans under the mark "Neets n Grubs" in national magazines such as Playboy [16] and Es-

12. The defendant has raised no issue as to whether the plaintiff's mark is "deceptively misdescriptive" as used in 15 U.S.A. § 1052 and we find none. As an example, in Neumann & Co. v. Bon-Ton Auto Upholstery, Inc., 51 C.C.P.A. 934, 326 F.2d 799 (1964), the court found the term "Vynahyde" to be deceptively misdescriptive when applied to non-leather seat covers. Furthermore, the statutory proscription is not against misdescriptive marks unless they are also deceptive. Application of Automatic Radio Mfg. Co., 404 F. 2d 1391 (C.C.P.A.1969).

13. At trial there was some controversy concerning the admissibility of Miss Mandt's and Mr. Schaul's testimony which was offered to try to show that "Grubb" is descriptive in character. A mark is descriptive only if the consuming public at large regards it as such. These two witnesses constitute a *de minimis* portion of the consuming public and any testimony as to how their fellow students described their dress style is hearsay. In any event, their references were to "grubbies", not "grub" and those references were to blue jeans and sweat shirts, not styled wearing apparel such as is sold by Robert Bruce under the "Grubb" trademark. Therefore, their testimony, even if admissible, is entitled to little weight since it is nothing but the opinion of non-experts on an ultimate question of fact as

to whether or not the plaintiff's trademark is descriptive. In re Electrada Corp., 145 U.S.P.Q. 96 (T.T.Ap.Bd.1965) ; Roux Laboratories, Inc. v. Clairol Incorporated, 427 F.2d 823 (C.C.Pa.1970).

14. We had grave doubts as to the admissibility of the transcript of the group interaction session because of the lack of sufficiently reliable foundation for its neutrality and the fact that the participants in the session represented a limited segment of the population, not even approximating a rudimentary sample. Moreover, the leader of the session conceded that its results were not projectable. However, that session too is ascribed so little weight by us as to make extended discussion as to its admissibility unnecessary.

15. Both Sears and its fabric supplier, Burlington Industries, Inc. regard "Neets n Grubs" to be a trademark. Sears applies the notation "TM" in its advertisements and labels. The "TM" notation was caused to be applied by Sears' National Advertising Review Committee and by its manager for national advertisements. Sears' supplier, Burlington Industries, Inc. filed a United States Trademark Application Serial No. 392,207 seeking to register "Neets-n-Grubs" for fabric on the Principal Register.

16. Playboy magazine reaches 43.3% of all males between the ages of 18 to 24.

quire, in newspapers, by radio, television, mailing pieces and in other forms of advertising published throughout the United States and wherever Sears' stores are located. Since Sears began selling [17] "Neets n Grubs" jeans in April of 1971, it has expended approximately $893,628 on newspaper, magazine and network radio advertising. Projected sales for the year 1971 were slightly less than ten million dollars.

Sears also prominently promotes the mark "Neets n Grubs" on the hangtags which are affixed to the jeans being sold by Sears. The "Grubs" portion stands apart from the remainder of "Neets n Grubs" on the hangtags and in many of the advertisements. Sears does not limit itself to the use of "Neets n Grubs" but often uses "Grubs" or "Grub" by itself and calls the prospective customer's attention to "The Grub thing".[18] Sears' hangtag uses the same combination of colors (i. e., fuschia, orange, black and white) as those used on Robert Bruce's "Grubb" hangtags, thereby creating, as we view it, a similar visual impression. The Court has compared plaintiff's extensively used radio commercial for its "Grubb" wearing apparel with defendant's radio commercial. Both commercials are quite similar in the repetitive use of the trademark "Grubb" by plaintiff and "Neets n Grubs" by defendant, and both include rock and roll background music.[19]

Sears is displaying its "Neets n Grubs" jeans in the "Jeans Joint" department located in its retail stores. The "Jeans Joint" departments also carry a line of sweaters and shirts displayed on the same counter as the jeans. Mannequins and other displays within defendant's "Jeans Joint" department display jeans and shirts as coordinated items of wearing apparel. Point of sale advertising posters within defendant's

"Jeans Joint" departments show coordinated shirts, sweaters and jeans. The same promotional theme is used throughout defendant's advertisements, as exemplified by the advertisements appearing in Playboy. Defendant's "Jeans Joint" department is located within its stores next to its "Put On Shop", and both sell youth-oriented merchandise. Thus, Sears' methods of retail promotion, i. e., displaying and selling of coordinated tops and bottoms, is similar to the plaintiff's, even though such methods may be standard practice.

We have examined samples of the Sears "Neets n Grubs" jeans. They appear to be of good quality. Moreover, much like some of the jeans introduced by plaintiff, they are fashionable and good looking, and far from "grubby".

### D. *Likelihood of Confusion*

On the basis of the foregoing facts, we find that Sears' name "Neets n Grubs" so closely resembles Robert Bruce's valid registered trademark "Grubb" as to be likely to cause confusion or mistake or to deceive the consuming public. In our view, the "Grubs" portion of the "Neets n Grubs" mark is the more distinctive and dominant portion of the mark. Moreover, the Sears advertisements emphasize "The Grub thing". We find that the appearance and pronunciation of the words "Grubb" and "Grub" or "grubs" are virtually identical. Even if the "Grubs" portion of Sears' mark were not viewed in a dominant light, we find "Neets n Grubs" to be confusingly similar to "Grubb". In fact, it is possible for an uninitiated purchaser to believe that "Neets n Grubs" represents two separate items and that the "Grubs" portion is a Robert Bruce "Grubb" item. The facts that there is a minimal spelling difference between the two words,

---

17. All of Sears' sales are at retail.

18. The typical "Neets n Grubs" advertisement includes the following sentence: "The Grub thing is how they feel—comfortably old, but new!".

19. Sears' witness Holsinger adverted to efforts to try to break down the "Sears syndrome" by which he described the general consumer acceptance of Sears' hard goods but not its soft goods.

and that one is plural, are not, as we see it, significantly differentiating factors. The apparel items involved are not so expensive as to be likely to engender a high degree of care by purchasers.

Our evaluation of likelihood of confusion is influenced by our finding that the contending marks are applied to goods which are similar or at least related in character. As noted in our findings of fact, the "Grubb" mark is now being applied to jeans. However, even insofar as the "Grubb" mark is not applied by Robert Bruce to jeans, it is applied to knit shirts and sweaters and other items which are sold in coordinated combination with "Grubb" slacks and Shelby or other jeans. Also relevant to the point at hand is the fact that both plaintiff and defendant's goods are designed for use by a similar market group (the youthful buyer) and are merchandised and advertised in a similar way. The likelihood of confusion is heightened by the fact that the use of the term "grub" (or "Neets n Grubs" for that matter) is essentially arbitrary as applied to clothing, having no inherent relationship to the products to which it is applied.

We do not find that the fact that Sears' product is sometimes referred to as *"Sears* Neets-n-Grubs" makes any difference in the result. Sears is known at large as a retailer which sells goods manufactured by others.[20] The prefixing of Sears' name ·may therefore aggravate or compound the confusion.

### E. *The Question of Sears' Intent*

Robert Bruce consumed a not inconsiderable amount of trial time in attempting to prove that Sears' infringement was designed to induce the public to believe that its jeans originated with or were sponsored by Robert Bruce. There was some evidence upon which such a conclusion could be based.

On April 30, 1968, Sears advertised in the Philadelphia Evening Bulletin a knit shirt that was an identical copy of plaintiff's best selling "Grubb" shirt. Sears' advertisement bore the trademark "Grub". The advertisement also bore the heading "New Colors, Coordinated Shirts/Slacks for STUDENTS". Robert Bruce, through its attorney, wrote to defendant pointing out that it had an application pending for the "Grubb" trademark. Sears replied stating that it had "decided to make no further use of the term [Grub]."

In 1970, a buyer for Sears contacted Mr. Ronald Stevens of Robert Bruce for the purpose of requesting plaintiff to make for Sears a collection of boys' swimwear and knit shirts similar in fashion to the "Grubb" line of apparel. The merchandise was to be sold in Sears' "Put On Shop" without the "Grubb" trademark. Robert Bruce's private label division thereupon sold walk shorts and coordinated knit tops to defendant which used the "Put On Shop" label on this merchandise and not the "Grubb" label. This merchandise was sold to Sears in 1970 and shipped to be sold in the Spring of 1971. In May 1971, Sears advertised a "Grubb" swim short on which the name "Grubb" was prominently displayed as part of the design in the same manner that plaintiff uses its trademark "Grubb" as part of the design for its shorts and casual pants. Upon protest by Robert Bruce, Sears represented to Robert Bruce that the publication of its advertisement was a mistake.

During the course of the trial, counsel for Sears conceded that it knew that Robert Bruce had registered the "Grubb" mark and was using it in commerce on its merchandise prior to inception of Sears' "Neets n Grubs" campaign (N.T. 277). However, Sears contends that it is not an infringer, and in

---

**20.** In this regard, it should be noted that Sears was a customer of Robert Bruce and had bought (and still buys) substantial quantities of Robert Bruce apparel, to which the Sears label is applied for sale through its regular retail channels in its merchandising departments.

no sense a deliberate infringer for several reasons. First, it denies likelihood of confusion. Secondly, it contends that its use of "Neets n Grubs" was predicated upon its good faith belief and the advice of counsel to the effect that the Robert Bruce mark is descriptive, that it lacked secondary meaning, and that it was thus unprotected.

Our evaluation of intent must be prefaced by a determination of whether the 1968 and 1970 incidents just described are indicative of a calculated effort to "pirate" Robert Bruce's mark. If so, our view of the "Neets n Grubs" campaign may be effected. However, our findings in this area must be set against the background of the nature of the Sears enterprise. It would be fair to state that Sears is a modern merchandising monolith. The evidence in this case is reflective of its enormity and its super-specialization. For example, Wayne Holsinger, the most important Sears witness, was a national merchandising manager whose domain was limited to "bottoms" (i. e., pants, slacks, jeans). In addition, evidence (which, we parenthetically note, we found most distressing) shows that the lawyers in the Sears legal department send inter-departmental communications identified only by their names and the legend "Department 766"! These examples buttress our finding on the point which is that the 1968 and 1970 incidents of actual infringement of "Grubb" were matters of isolated happenstance and not design, resulting from the lack of communication between Sears' merchandising departments and made possible by the Sears—Robert Bruce private label relationship (see n. 20). We further find that these incidents were unrelated to the adoption of the "Neets n Grubs" mark by a totally different Sears department apparently not in direct contact with the shirt and swimwear departments where the 1968 and 1970 incidents occurred.

Having put the 1968 and 1970 incidents aside, we are satisfied that Sears adopted the "Neets n Grubs" mark in good faith and in reliance on the advice of its counsel that use of that mark would not infringe on "Grubb". Our Opinion has, of course, rendered counsel's advice erroneous. To the advantage of Robert Bruce, it is fundamental in trademark law that its success in this lawsuit does not depend upon proof of Sears' intent. See, Gulden v. Chance, 182 F. 303 (3d Cir. 1910); Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 908 (3d Cir. 1952). If the Grubb mark is entitled to protection, and if "Neets n Grubs" is confusingly similar (and we have resolved both of these queries (see *infra*) affirmatively), then Robert Bruce is entitled to injunctive relief regardless of Sears' intent. On the other hand, if Sears adopted the mark in good faith, in reliance upon the advice of counsel, with no fraudulent intent and with no intent to cause confusion or to deceive the public (as we also find), then Sears' intent is crucial in relieving it from liability for money damages (see discussion *infra*).[21]

21. We have referred above to the Group Interaction Sessions conducted under the aegis of Sears' advertising agency. That agency (McCann-Erickson) also ran a name-test at Sears' request to determine a suitable name for jeans which, according to Sears, revealed that "Neets n Grubs" was the best of the names studied. Sears offered these studies to corroborate its contention (*supra*) that its adoption of the "Neets n Grubs" mark, rather than constituting an act of piracy, was in pursuance of a good faith market research effort to determine the best name for its product. The modus operandi was that McCann-Erickson arranged for a market research firm known as Marplan to conduct a "name test" for jeans in which five names approved by Holsinger, and including Neets n Grubs were tested. The other names tested were Raggs, Dominant Jeans, Grooves and Give n Take. Of the five names tested, Neets n Grubs was the most favored, receiving more votes in a paired comparison with any of the other four names and the highest number of favorable responses when the participants were asked to describe their impressions of each name. We have already expressed our dim view

## III.  DISCUSSION

### A.  *Introduction*

The foregoing findings of fact make it clear that, as we view the case, the crucial issues before us are those of the descriptiveness of the "Grubb" mark and likelihood of confusion.  The subsidiary and ultimate findings of fact just recited do not obviate the need for discussion of the applicable statutes and case-law.  As we have said above, while the determination of descriptiveness and likelihood of confusion are principally determinations of ultimate fact, those determinations cannot be, and have not been, made in a vacuum.  Accordingly, we now set forth, as sparingly as the subject permits, some of the more important authorities which have acted as our guide, and against which we have tested our conclusions to see if they measure up to the wise precedent of past cases.  Because Robert Bruce's mark is registered, the trademark infringement is a statutory, as well as a common law question.

### B.  *Is the "Grubb" Mark Descriptive? . Is it a Strong or Weak Mark?*

Sears' threshold position in the case stems from the hornbook proposition that a word or phrase which is primarily descriptive of the qualities, ingredients, or characteristics of the article to which it is attached or to which it has reference cannot be claimed as an exclusive trademark.  See 3 Callman Unfair Competition, Trademarks and Monopolies (1969 Ed.) § 70.1, p. 106; Standard Paint Co. v. Trinidad Asphalt Manufacturing Co., 220 U.S. 446, 454, 31 S.Ct. 456, 55 L.Ed. 536 (1911).  In such circumstances, the use of a similar name by another does not constitute an infringement even though there is some likelihood that the purchasing public might be confused as to the origin of the product.  *Id.* Callman defines descriptive marks as follows:

"Designations are descriptive if they naturally and normally direct attention to the qualities, ingredients, appearance, effect, purpose, or other features of goods or services.  This may be attributable to the simplicity of the word and the fact that it is readily understood in all its implications.  The descriptiveness of a designation should be determined not in the abstract, but in relation to the goods to which it relates and the context in which it is used."  (footnotes omitted).  3 Callman § 71.1, pp. 112–13; *see also*, Norm Thompson Outfitters v. General Motors Corp., 448 F.2d 1293, 1295 (9th Cir. 1971).

However, unless a word gives some reasonably accurate—some tolerably distinct knowledge—as to what the product is made of, it is not descriptive within the meaning of trademark terminology.  Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 699, 700 (2nd Cir. 1961).

In our findings of fact, we have discussed our reasons for our findings as to the nondescriptiveness of "Grubb".  In order not to unduly prolong this Opinion, we incorporate those findings here, and couple them with the thought that our conclusion, which is that "Grubb" is not a descriptive term, but that, as applied to the goods in question, is counter-descriptive, coined, arbitrary and fanciful, stems from and is supported by the legal criteria which we have just enunciated.  We add only that, in the language of the cases, "Grubb" gives no tolerably distinct knowledge as to the qualities, appearance, effect or purpose of the goods, and if it gives any impression, *i. e.*, that "Grubb" goods are "grubby", it is an incorrect one.

Our determination that the "Grubb" mark is coined, arbitrary and fanciful leads inevitably to the legal conclusion that it is a strong mark which is entitled to protection without proof of the acqui-

---

of the group interaction session.  The name *test* also was *conducted from a* limited and virtually valueless sample. If admissible, these studies are entitled

to but minimal weight.  In any event, it *is unnecessary to comment upon them* further in view of our ultimate finding on the question of Sears' intent.

sition of secondary meaning. As Callman points out:

"[A]n arbitrary or fanciful name which bears little or no relationship to the product will be protected against any attempted imitation." Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 44 S.Ct. 615, 68 L.Ed. 1161 (1924); Gold Dust Corp. v. Hoffenberg, 87 F.2d 451 (2d Cir. 1937); Family Circle, Inc. v. Family Circle Associates, Inc., 332 F. 2d 534 (3d Cir. 1964); 3 Callman § 70.2 p. 106.[22]

The Third Circuit has explained the reason for the distinction for purposes of trademark appropriation between descriptive marks and those entitled to technical trademarks protection without proof of secondary meaning

"The basic reason for refusing to allow the exclusive appropriation of descriptive words in trademarks is the danger of depleting the general vocabulary available to all for description and denomination of articles of commerce. It is unwise to risk the development of a situation in which those attempting to market their goods will find that they can not use apt normal words or phrases in depicting or characterizing articles because of language preemptions by others. So the legal protection of trademarks is restricted in manner calculated to keep such descriptive words free for all." Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 906 (3d Cir. 1952).

The Third Circuit's rationale supports our conclusion here.

In some respects, this case is not unlike Fancee Free Mfg. Co. v. Fancy Free Fashions Inc., 148 F.Supp. 825, 830 (S. D.N.Y.1957), where Judge Dawson stated:

"Defendant's affirmative defense that the words 'Fancee Free' constitute a descriptive term which is not susceptible to exclusive appropriation as a trade-mark is hardly worthy of discussion. The words 'Fancee Free' were duly registered as a trade-mark by the Patent Office which obviously did not think that they were a descriptive term. Compare 15 U.S.C.A. § 1052(e) with 15 U.S.C.A. § 1052(f). Furthermore the words are in no sense descriptive of the merchandise but rather are of that fanciful type that customarily are appropriated and used as trade-marks. See Douglas Laboratories Corp. v. Copper Tan, Inc., 2 Cir., 210 F.2d 453, certiorari denied 1954, 347 U.S. 968, 74 S.Ct. 779, 98 L.Ed. 1109.

The defendant's argument that the trade-mark is descriptive is based upon his assertion that it is a term 'designating free movement.' *If this is so it would seem that the term is hardly descriptive but rather the very antithesis of the purpose for which I would suppose girdles and brassieres are made and sold.* Defendant's counterclaim seeking cancellation of the plaintiff's registered trade-mark on the ground that the registered trade-mark is merely descriptive should be dismissed." (emphasis added).[23]

Having concluded that "Grubb" is a strong mark which is entitled to protection without proof of secondary meaning, we deem it unnecessary to consider whether or not it has in fact acquired secondary meaning and turn to the legal principles governing the question of likelihood of confusion.

C. *Is The Mark "Neets n Grubs" Confusingly Similar to "Grubb"*

■ The test of infringement set forth in the Lanham Act is the same as

---

**22.** In the context of this case, "Grubb" is not even suggestive of the goods. In any event, marks that are suggestive are good trademarks. See Q-Tips, Inc. v. Johnson & Johnson, 206 F.2d 144, 146 (3d Cir. 1953).

**23.** Callman also observes that a word or phrase which is, by nature, descriptive, may nonetheless be used in a nondescriptive manner, because it is unrelated to the article in question. In such instances it is entitled to protection as a good mark. 3 Callman § 71.1(e) p. 149.

that of the common law which it codifies.[24] The test is whether the defendants designation, as compared with the plaintiff's "is likely to cause confusion or to cause mistake, or to deceive. . . . " It is important to note that the established statutory and common law tests of infringement do not require actual confusion, but only that confusion, mistake or deception be likely. See, *inter alia*, Telechron, Inc. v. Telicon Corp., 198 F.2d 903, 909 (3d Cir. 1952); Villager Inc. v. Dial Shoe Company, 256 F.Supp. 694 (E.D.Pa.1966).[25]

The Restatement of Torts § 729 (1938) set forth the generally accepted factors to be considered in determining whether a particular designation is confusingly similar to another's trade name:

"(a) the degree of similarity between the designation and the trademark or trade name in

(i) appearance;

(ii) pronunciation of the words used;

(iii) verbal translation of the pictures or designs involved;

(iv) suggestion

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers."

The Restatement's applicable factors have been accepted by the Third Circuit. Sears, Roebuck & Co. v. Johnson, 219 F. 2d 590, 592 (3d Cir. 1955).

*Sears* has cautioned us that, in applying the Restatement's criteria, we must view the marks in their entirety:

"The court should consider the mark 'as a whole and not dissected,' for the ordinary buyer does not stop to dissect the marks; if the latter is deceived, it is attributable to the mark as a totality, and not normally to any particular part of it; . . . . What counts is the ensemble.' " 3 Callman, § 81.1 p. 570.1.

We have already discussed the degree of similarity between "Grubb" and "Neets n Grubs" by way of appearance and pronunciation and have highlighted the fact that "Grubb" and "Grubs" are virtually identical. We conclude that the "Neets n Grubs" mark, viewed as an ensemble, is confusingly similar to "Grubb". First of all, we find that the "Grub" portion of the "Neets n Grubs" mark is the dominant and distinctive portion of the mark. Secondly, it is possible, for the uninitiated purchaser, to believe that "Neets n Grubs" are two separate items and that the "Grub" portion is a Robert Bruce "Grubb" item. Moreover, this possibility and the possibility of confusion in general has been enhanced by Sears' election to talk in its advertisements about "The Grub Thing".

There are a number of cases where the difference between plaintiff's and defendant's marks was the addition of a second word or name. There is ample authority, in cases not too far different from this, that the addition of the second word or name will make no difference. *See, e. g.*, Thaddeus Davids Co. v. Davids, 233 U.S. 461, 34 S.Ct. 648, 58 L.Ed. 1046 (1914) ("Davids' " vs. "C. I. Davids' "); Villager Inc. v. Dial Shoe Company Inc., *supra* ("The Villager"

---

24. Whether state or federal law is applicable to the present situation need not be decided, for there is no difference. *See* Sears, Roebuck & Co. v. Johnson, 219 F.2d 590, 592 (3d Cir. 1955). Pennsylvania in fact looks to the federal decisions for its law of trade name infringement. Goebel Brewing Co. v. Esslingers, Inc., 373 Pa. 334, 95 A.2d 523 (1953).

25. Plaintiff produced several of its retail customers as witnesses, and offered to prove by them that these retailers feared and expected that there would be actual confusion and that one of them refused to buy the "Grubb" line for 1972 for that reason. However, the Court refused to admit such evidence as demonstrating actual confusion.

and "Junior Villager" vs. "Miss Villager" for shoes); King-Kup Candies, Inc. v. King Candy Co., 48 C.C.P.A. 948, 288 F.2d 944 (1961) (opinion by Judge Kirkpatrick) ("King's" vs. "King-Kup" for candies sold in a cup); Century Distilling Co. v. Continental Distilling Co., 106 F.2d 486 (3d Cir. 1939) ("Dixie Belle" and "Dixie Beau" vs. "Dixiana" and "Dixie Dew"); Coty, Inc. v. Parfums de Grande Luxe, Inc., 2 Cir., 298 F. 865 ("Coty" vs. "Ernest Coty"); Holland Furnace Co. v. New Holland Machine Co., 24 F.2d 751 (E.D.Pa.1927) ("Holland" vs. "New Holland"); Weaver Mfg. Co. v. The Joyce Cridland Co., 125 USPQ 245 (TT Ap.Bd.1960) ("Twin-Post" vs. "Twin-Master"); Triangle Publications Inc. v. Standard Plastic Products, 241 F.Supp. 613, 616 (E.D.Pa.1965) ("Seventeen" vs. "Miss Seventeen"); Bunte Bros. v. Standard Chocolates, Inc., 45 F.Supp. 478 (D. Mass.1942) ("Diana" vs. "Diana Deane"); and La Maur Inc. v. Revlon Inc., 245 F.Supp. 839, 845 (D.Minn. 1965) ("Style" vs. "Style & Set" for hair setting lotion). In all of these cases, the court found likelihood of confusion and granted the plaintiff relief. We find no less confusion here.

Citing us to a number of so called "house mark" cases,[26] Sears has argued the proposition that the possibility of confusion is negated by the fact that both "Grubb" and "Neets n Grubs" are used only in conjunction with housemarks or tradenames by the respective parties. It is true that the name "Robert Bruce" generally appears on the "Grubb" tags, packaging and advertising, and that the name "Sears" generally appears in conjunction with its "Neets n Grubs" sew-in labels and advertising (although the advertising does not say precisely "Sears Neets n Grubs"). In any event, we deem the housemark argument to be counter productive for Sears' case. Sears is known at large as a retailer, not a manufacturer, which sells goods manufactured by others (including those, see n. 20, *supra*, manufactured by Robert Bruce!). Accordingly, we conclude that the prefixing of the Sears name aggravates and compounds the likelihood of confusion. To similar effect see Menendez v. Holt, 128 U.S. 514, 9 S.Ct. 143, 32 L.Ed. 526 (1888); Electronic Communications Inc. v. Electronic Components For Industry, 443 F.2d 487, 492 (8th Cir. 1971); W. E. Bassett Co. v. Revlon Inc., 435 F.2d 656, 662 (2d Cir. 1970).

The Restatement criteria include the relation in use or manner of marketing between the goods or services marketed by the actor and those marketed by the other. Application of this criterion to the facts adds materially to the plaintiff's case. While we shall refrain from repeating our factual conclusions here, at sections II. C. and II. D. of this Opinion we underscored the similarity in marketing and advertising of "Grubb" and "Neets n Grubs" goods, and the fact that both lines sought to reach the same youth market.

■■ For better or for worse,[27] the law of trademarks in England and in this country has evolved in such a way that the possession of a strong mark

26. R. G. Barry Corporation v. A. Sandler Co., Inc., 406 F.2d 114, 116 (1 Cir. 1969); Sylvania Electric Products v. Dura Electric Lamp Company, 247 F.2d 730, 734 (3d Cir. 1957); KoolVent Metal Awning Corp. of America v. Price, 368 Pa. 528, 532, 84 A.2d 296 (1951); Hiram Walker & Sons, Inc. v. Penn-Maryland Corporation, 79 F.2d 836, 839, (2 Cir. 1935); John Morrell & Co. v. Reliable Packing Co., 295 F.2d 314, 317 (7 Cir. 1961); B & L Sales Associates v. H. Daroff & Sons, Inc., 421 F.2d 352, 353 (2 Cir. 1970).

27. *Cf.* dissenting opinion of Judge Jerome Frank in Triangle Publications v. Rohrlich, 167 F.2d 969 (2d Cir. 1948). That case resulted in injunctive relief in favor of the publisher of Seventeen Magazine against the use of the Seventeen mark on girdles, a product which the plaintiff did not contemplate selling. *Inter alia,* Judge Frank observed:

"Question has been raised as to whether the trade-name doctrine, by its creation of 'perpetual monopolies,' has not injured consumers, a question of peculiarly serious import in these days

may enjoin the use of a confusingly similar mark even on dissimilar goods.[28] A fortiori, the position of the owner of a mark against an infringer is stronger when the defendant's mark is applied to related goods,[29] not to mention

when living-costs are notoriously oppressive. Since, however, the Supreme Court has approved the doctrine, an intermediate court (such as ours) must enforce it. But, in the absence of legislation so requiring, we should not expand it.

. . . . .

Without doubt, the judge-made trade-name doctrine or concept fosters monopolies; and, generally speaking, the common-law tradition is inimical to monopolies (although opposition to monopoly when it takes the form of an obsessive monopoly-phobia becomes absurd). Some writers, disturbed by the suggestion that judicially-protected trade-names are monopolies, protest that the judicial protection of trade-names rests on prevention of unfairness between competitors, not on protection of monopoly. But, no matter by what doctrinal path the courts arrive at their results in this field, the judicial restraints of defendants do yield plaintiffs' monopolies. To the practical, social consequences of their decisions, the courts ought not shut their eyes. . . . " (footnotes omitted).

28. *See, e. g.*, Wall v. Rolls-Royce of America, 4 F.2d 333 (3d Cir. 1925); Yale Electric Corp. v. Robertson, 26 F.2d 972 (2d Cir. 1928); Safeway Stores Inc. v. Safeway Properties, 307 F.2d 495 (2d Cir. 1962). Communications Satellite Corp. v. Comcet Inc., 429 F.2d 1245 (4th Cir. 1970); Great Atlantic & Pacific Tea Co. v. A & P Radio Stores, 20 F. Supp. 703 (E.D.Pa.1937); Triangle Publications Inc. v. Standard Plastic Products, 241 F.Supp. 613 (E.D.Pa.1965) (a magazine vs. luggage); Ford Motor Co. v. Ford Insecticide Corp., 69 F.Supp. 935 (E.D.Mich.1947); John Walker & Sons Ltd. v. Bethea, 305 F.Supp. 1302 (whiskey vs. a motel) (D.C.1969); Tiffany & Co. v. Tiffany Productions, 237 A.D. 801, 260 N.Y.S. 821 (1932) aff'g 262 N.Y. 482, 188 N.E. 30 (1933) (jewelry vs. movies); The Eastman Photographic Company v. The John Griffiths Cycle Corp. Ltd. and The Kodak Cycle Co. ltd., 15 C.P.C. 105 (High Court of Justice—Chancery Div. 1898).

The Yale case contains an oft cited pronouncement by Judge Learned Hand: "Therefore it was at first a debatable point whether a merchant's good will, indicated by his mark, could extend beyond such goods as he sold. How could he lose bargains which he had no means to fill? What harm did it do a chewing gum maker to have an ironmonger use his trade-mark? The law often ignores the nicer sensibilities.

However, it has of recent years been recognized that a merchant may have a sufficient economic interest in the use of his mark outside the field of his own exploitation to justify interposition by a court. His mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill. If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control. This is an injury, even though the borrower does not tarnish it, or divert any sales by its use; for a reputation, like a face, is the symbol of its possessor and creator, and another can use it only as a mask. And so it has come to be recognized that, unless the borrower's use is so foreign to the owner's as to insure against any identification of the two, it is unlawful. . . . "

29. *See, also,* Rosenberg Bros. v. Elliott, 7 F.2d 962 (3d Cir. 1925), where "Fashion Park" was used by plaintiff for clothes and by defendant for hats; Del Monte Special Food Co. v. California Packing Corp., 34 F.2d 774 (9th Cir. 1929), where plaintiff sold called food products and defendant sold oleomargarine; Kotabs v. Kotex Co., 50 F.2d 810 (3d Cir. 1931), where plaintiff manufactured and sold sanitary pads and defendant a medicine for relief of menstrual pain; Finchley Inc. v. Finchly Co. Inc., 40 F.2d 736 (D.Md.1929) (men's vs. women's clothing); Aunt Jemima Mills Inc. v. Rigney & Co., 247 F. 407 (2d Cir. 1917), where plaintiff sold flour and defendant sold pancake syrup and sugar creams; Akron-Overland Tire Co. v. Willys Overland Co., 273 F. 674 (3d Cir. 1921), where the plaintiff sold automobiles and the defendant sold retreaded tires; Gant of New Haven Inc. v. Chez Boye Parfums Int., 256 F.Supp. 982 (M.D.Fla.1966) (shirts vs. mens toiletries); and the case of Carling Brewing Co. Inc. v. Philip Morris Inc., 297 F.Supp. 1330 (N.D.Ga.1968), where the court deemed beer and cigarettes to be related. In all of the cited cases, the plaintiff prevailed as against the case of a mark on related goods.

similar goods. As to similar goods, *see,* Villager Inc. v. Dial Shoe Company, Inc., *supra* (shoes); King-Kup Candies Inc. v. King Candy Co., *supra* (candies in a cup); Consolidated Cigar Corp. v. Liveram, 106 USPQ 333, 336 (Com. of Pat. 1955) ("Dutch Masters" vs. "Dutch Pride" Cigars); La Maur Inc. v. Revlon Inc., *supra* (hair setting lotions). In this case, at best for Sears, the goods are closely inter-related. The evidence shows however that many of the goods sold under the "Grubb" label (*i. e.,* jeans) are the same as "Neets n Grubs" by Sears.

Our review of the Restatement criteria, then, has confirmed our view of likelihood of confusion.[30] In accordance with the foregoing discussion and authorities, plaintiff is entitled to injunctive relief.[31]

### D. Is Robert Bruce Entitled To Damages and An Accounting?

In the various pleadings which it has filed Robert Bruce has also asked this Court to award money damages and an accounting. By the term "damages" we mean all injury to a plaintiff proximately caused by a defendant's infringement, such as lost profits, loss of good will, injury to reputation, expenses incurred in preventing consumers from being deceived, etc. The term "accounting" comprehends the equitable remedy whereby a defendant must disgorge the profits made from the unfair use of a plaintiff's trademark or tradename.

Claims for monetary relief in trademark actions are generally litigated at a separate hearing, after the determination of liability, either before the Court or before a special master. However, the basis for such supplementary proceedings must be established at trial. The basis for monetary relief is summarized in the Lanham Act, 15 U.S.C. § 1117:

"When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and *subject to the principles of equity,* to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. . . ." (emphasis added).

This pecuniary recovery is subject to the principles of equity and a mere showing of infringement will not mandate an award of monetary relief. Williamson Dickie Mfg. Co. v. Davis Mfg. Co., *supra.* We will proceed then to determine whether the equities require the granting of monetary relief, or whether they are satisfied by the issuance of an injunction. Williamson Dickie Mfg. Co. v. Davis Mfg. Co., 251 F.2d 924 (3rd Cir.

---

30. We deem it unnecessary to consider the criterion of intent. We have, however, observed that the price of the goods involved makes it less likely that prospective purchasers will exercise a high degree of care in distinguishing plaintiff's and defendant's goods, thus satisfying another Restatement criterion.

31. As indicated above, the same result applies on the statutory trademark, common law trademark and unfair competition theories of plaintiff. In view of our conclusions, we find it unnecessary to address ourself to plaintiff's theory that defendant's colorable imitation of plaintiff's "Grubb" trademark amounts to a false description of origin within the meaning of the Lanham Act, § 43(a), 15 U.S.C. § 1125.

As this Opinion was about to be filed, it came to our attention that the Patent Office has made an initial determination, refusing the application of Burlington Industries, Inc. for the mark "Neets n Grubs" (see n. 15) on the basis that it so resembles the mark "Grubb" as to be likely to cause confusion. We received a certified copy to this effect on May 16, 1972. This initial determination is subject to review within the Patent Office and Sears' counsel has intimated that Burlington Industries, Inc. will seek review of that determination within the Patent Office. We underscore that our decision in this matter was reached long before receipt of notice of the Patent Office's initial determination.

1958); Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1957). We note at the outset that, on the occasion of a pretrial meeting, plaintiff's counsel indicated that its object in the proceeding was injunctive relief and not damages or accounting; however, we do not consider plaintiff bound by that representation and do not base our decision upon it.

While it is difficult to perceive a common theme in the many decided cases on the subject, most cases consider that the intent of the infringer and his conduct is relevant to the remedy that should be afforded, even though his intent is not determinative of the question of infringement (see discussion *supra*). Furthermore, the cases recognize that there may be degrees of intent such as deliberate, willful or fraudulent, *see*, Century Distilling Co. v. Continental Distilling Corp., 205 F.2d 140 (3d Cir. 1952). This circuit has not disturbed an award of an accounting upon a finding by the district court that the defendant's infringement was deliberate or willful (in the sense that he had actual knowledge of the plaintiff's trademark) but not fraudulent. Century Distilling Co. v. Continental Distilling Corp., *supra* (accompanied by clear showing of damages and defendant's profits); Williamson Dickie Mfg. Co. v. Davis Mfg. Co., *supra*. *See also*, Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L.Ed. 629 (1916). Other courts have affirmed a district court's refusal to award an accounting where the defendant's intent or character of conduct was not fraudulent. Champion Spark Plug Co. v. Sanders, *supra;* Baker v. Simmons Co., 325 F.2d 580 (1st Cir. 1963); Fuller Products Co. v. Fuller Brush Co., 299 F.2d 772 (7th Cir. 1962); McCormick & Co. v. B. Manischewitz Co., 206 F.2d 744 (6th Cir. 1953).

The fairest reading that we can make of the caselaw is that the equity of intent should not be viewed in the abstract, but must be balanced with the other factors of the case. To be more specific, the Court, in an exercise of discretion, must balance the evil of the infringer's intent or conduct against the actual or likely harm to the innocent trademark owner (i. e., its direct pecuniary losses, such as loss of direct sales, or its indirect pecuniary losses, such as a diversion of its profits to the defendant). Therefore, the more fraudulent the intent or conduct of infringer is found to be, the lesser the plaintiff need show actual or likelihood of pecuniary harm, for we must keep in mind that the trademark laws are designed to protect not only the trademark owner but the consuming public as well.

In our previous discussion, we found that Sears entertained a good faith belief that it was not infringing because of its belief that "Grubb" is descriptive. We recognize that Sears gambled on the advice of counsel and lost. While some cases would justify the classification of Sears as a deliberate infringer, others would not; see, *e. g.*, Square D Co. v. Sorenson, 224 F.2d 61 (7th Cir. 1955), where the court refused an accounting where there was a good faith infringement; Carl Zeiss Stiftung v. Veb Carl Zeiss Jena, 433 F.2d 686 (2d Cir. 1970) where the court held that the plaintiff must prove bad faith or fraudulent intent on the part of the infringer even though it had notice of the plaintiff's trademark. In the case at bar, we have found no evidence of actual confusion, and no intent to deceive the public or cause confusion. Neither has the evidence offered before us indicated the likelihood of tangible proof that Robert Bruce has suffered any substantial pecuniary damages or that Sears has markedly profited from the infringement in the short time it has sold "Neets n Grubs" (essentially since August 1971). We note too that there is no evidence that there is a likelihood of harm that would not be obviated by an injunction. Finally, the evidence before us (there is no indication that Robert Bruce has sustained substantial losses) leads us to believe that the cost of further proceedings for accounting and damages far

outweigh the likelihood of success. *See* Future Farmers of America v. Romack, 114 F.Supp. 796 (E.D.Ill.1953), aff'd 211 F.2d 925 (7th Cir. 1954); Consumers Petroleum Co. v. Consumers Co. of Ill., 169 F.2d 153 (7th Cir. 1948).

For all of the foregoing reasons, the "balancing test" leads us to the conclusion that, under the principles of equity, Robert Bruce is not entitled to damages and an accounting. Accordingly, we enter the following Order.

### ORDER

It is hereby ordered, adjudged and decreed:

1. That the defendant, Sears, Roebuck & Co., its directors, officers, agents, servants, employees and attorneys, and all those acting otherwise in privity or in concert with defendant, are immediately, permanently, and perpetually restrained and enjoined from doing, abiding, causing or abetting, directly or indirectly, any of the following:

(a) Infringing plaintiff's trademark Grubb.

(b) Using Neets n Grubs in connection with the sale of jeans or other related goods or from using any words or letters which in any way imitate or simulate the trademark Grubb so as to be likely to cause confusion or mistake or to deceive.

(c) Engaging in any acts or activities calculated to trade upon the trademark, reputation or good will of plaintiff or in any manner to unfairly compete with plaintiff.

(d) Using in the sale, offering for sale, promoting, advertising, marketing or distributing of jeans, slacks, pants or related goods or on any package, cartons, labels, display cards, wrappers, advertising matter or the like whatsoever, Neets n Grubs or any simulation or imitation or derivative thereof in such manner as to feature Neets n Grubs or any variant thereof so as to cause confusion or to be likely to cause confusion or to deceive plaintiff's customers and the purchasing public into the belief that the goods sold by defendant are goods manufactured and/or sold by the plaintiff.

(e) Using in the sale, offering for sale, promoting, advertising, marketing and distributing of jeans, pants, slacks or related articles of clothing or similar goods or on any packages, cartons, labels, display cards, wrappers or any advertising matter or the like whatsoever, Neets n Grubs or any simulation or imitation or derivative thereof in such manner as to feature Neets n Grubs or any variant thereof so as to deceive or tend to deceive or to falsely designate the origin or to falsely describe or represent the source of the goods or otherwise create confusion among plaintiff's customers and the purchasing public as to the source of origin of defendant's goods.

2. That defendant deliver up for destruction any and all labels, packages, cartons, display pieces, wrappers, advertising material, letters, billheads, and any matter or description of any nature whatsoever, bearing Neets n Grubs or any word, group of words, letter or group of letters which are a colorable imitation of plaintiff's trademark Grubb within thirty days from the date of this Order.