**Isabel Manning Hewson KIRKLAND, Plaintiff,**

v.

**NATIONAL BROADCASTING COMPANY, INC., Defendant.**

Civ. A. No. 75–572.

United States District Court, E. D. Pennsylvania.

Dec. 17, 1976.

Zachary T. Wobensmith, Philadelphia, Pa., for plaintiff.

Bancroft D. Haviland, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

The question presented in this case is whether plaintiff has any proprietary rights in a name used by defendant as the title for a TV series. Having concluded that plaintiff abandoned the name, I must grant defendant's motion for summary judgment.

## I. *Factual and Procedural Background*

In 1933, plaintiff originated and authored a story entitled "Land of the Lost," which eventually became a radio program broadcast on various networks from 1943 to 1948.[1] During this period, children who listened to the program formed "Land of

1. The first broadcast was over the Blue Network on September 5, 1943. Thereafter, it was broadcast over the American Broadcasting Co., Inc. (October, 1943–September 15, 1945), the Mutual Broadcasting Network (October 14, 1945–June 29, 1946) and, once again, the ABC Network (October 11, 1947–July 3, 1948).

The basic theme of plaintiff's program involved two children in a rowboat on a lake who encountered a red fish named Red Lantern, who guided the children through the Land of the Lost, where "everything that is lost since the beginning of time goes there and comes to life, lives in its own place . . . " (Deposition of Mrs. Kirkland at page 14). In each succeeding show, the group would travel to new places, such as Kitchenville, and new characters developed from lost objects would be introduced.

the Lost" clubs, but these clubs apparently ceased functioning prior to January, 1954.[2] Other commercial uses of plaintiff's concept included comic books, a record album, a book entitled "The Land of the Lost," and three cartoons, produced by Paramount Pictures, Inc., following an assignment by plaintiff to Paramount of a portion of her copyright interest.[3]

The present controversy stems from a children's television program entitled "Land of the Lost," which commenced broadcast on the NBC television network in September, 1974, and which continues to appear each Saturday morning.[4] The theme of this story involves two teenagers and their father who travel through a "time vortex" into a prehistoric world. In mid-1974, NBC began issuing press releases detailing its plans for the show. Counsel for Mrs. Kirkland contacted RCA, NBC's parent company, and there was later correspondence between Mrs. Kirkland and NBC (Defendant's Exhibits L through P). However, no compromise could be reached and on February 26, 1975, plaintiff commenced this suit, alleging the common law action of unfair competition for use of the title. Following discovery, defendant moved for summary judgment.

▪ In order for a summary judgment motion to be granted, the movant must show two things: (1) there is no genuine issue as to any material fact and (2) he is entitled to judgment as a matter of law. Fed.R.Civ.Proc. 56(c); see generally 6 *Moore's Federal Practice* § 56.09–56.23

(1974). It is clear that plaintiff may not rely on the conclusory allegations of her complaint when faced with this motion, *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970); *Brown v. Cliff*, 341 F.Supp. 177, 179 (E.D.Pa.1972), but must "show by some admissible evidence that there is a genuine issue as to a material fact." *Berry Brothers Buick, Inc. v. General Motors Corp.*, 257 F.Supp. 542, 545 (E.D.Pa.1966), aff'd 377 F.2d 552 (3d Cir. 1967). I find no factually disputed issues which are material and accordingly resolve the instant motion solely on the questions of law.

## II. *The Claim of Unfair Competition*

▪ Although nothing in the Copyright Clause of the Constitution [5] nor in the new Copyright Act itself [6] expressly precludes protection for titles under the copyright laws, it has been well-established that a copyright in literary material does not secure any right in the title itself. *Duff v. The Kansas City Star Co.*, 299 F.2d 320, 323 (8th Cir. 1962); *Warner Bros. Pictures, Inc. v. Majestic Pictures Corp.*, 70 F.2d 310 (2d Cir. 1934); *Harms, Inc. v. Tops Music Enterprises, Inc. of Cal.*, 160 F.Supp. 77, 81 (S.D.Cal.1958); 1 *Nimmer on Copyright*, § 34, p. 140 (1976).[7] This protection has, in certain limited circumstances, been afforded under the trademark theory, *National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733 (S.D.N.Y.), aff'd 497 F.2d 1343 (2d Cir. 1974) (title as trade name); *In re Cooper*, 254 F.2d 611, 45 CCPA 923 (1938) (title for series of books),

---

**2.** See deposition of Mrs. Kirkland, p. 54.

**3.** All of these ventures apparently took place between the years 1945 and 1951, although Mrs. Kirkland did receive royalties on the comic books and album until 1955, and for the books for a few years thereafter.

**4.** NBC does not own this program, but only licenses the right to broadcast it. In turn, NBC pays a fee to those who produce the show, Sid & Marty Krofft, a practice common in television programming.

**5.** Article I, § 8, cl. 8, provides that Congress shall have the power
 "To promote the Progress of Science and useful Arts, by securing for limited Times to

Authors and Inventors the exclusive Right to their respective Writings and Discoveries."

**6.** This revision, P.L. 94–553, 94th Congress, 2d Session, printed at 45 U.S.L.W. 145 (December 7, 1976), replaces in entirety Title 17 of the United States Code, originally enacted and codified on July 30, 1947.

**7.** See also 2 *Nims, Unfair Competition and Trademarks*, § 272, p. 889 (4th ed. 1947), wherein it is stated that "[t]he right secured by the copyright laws is the right to use a literary composition—the product of the mind and genius of the author—not the name or title given to it."

but generally, a title will be safeguarded only under a theory of unfair competition. 1 *Nimmer,* supra at 141; see generally, Netterville and Hirsch, *Piracy and Privilege in Literary Titles,* 32 S.Cal.L.Rev. 101 (1959).

■ Unfair competition is an equitable concept, resting on general principles of fairness in business practices. *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir. 1974). The unfair competition concept is to be distinguished from trademark or copyright infringement in that it does not involve the violation of an exclusive right to use a work, mark, or symbol, but rather involves conduct which is contrary to honest industrial and commercial practice. *House of Westmore v. Denney,* 151 F.2d 261, 265 (3d Cir. 1945); *Surgical Supply Service, Inc. v. Adler,* 206 F.Supp. 564, 570 (E.D.Pa.1962). Although specific guidelines are wanting, there are at least two essentials which must be established before unfair competition can be found: secondary meaning and likelihood of confusion. I shall consider them separately.

## A. *Secondary Meaning*

■ First, in order to protect a literary title from appropriation on the ground of unfair competition, the title must have attained a secondary significance or "secondary meaning." *Becker v. Loew's, Inc.,* 133 F.2d 889, 893 (7th Cir.), cert. denied, 319 U.S. 772, 63 S.Ct. 1438, 87 L.Ed. 1720 (1943). "To establish secondary meaning, the article itself must be so clearly identified with its source that its supply from any other source is clearly calculated to deceive the public and lead it to purchase the goods of one for that of another." *Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co.,* 133 F.2d 266, 270 (7th Cir. 1943); *Field Enterprises Educational Corp. v. Grosset & Dunlap, Inc.,* 256 F.Supp. 382, 388 (S.D.N.Y.1966). The plaintiff must show that the primary significance of the title in the minds of the consuming public is not in the title but the producer. *Alfred Dunhill, etc. v. Kasser Dist. Prod. Corp.,* 350 F.Supp.

1341, 1359 (E.D.Pa.1972) aff'd 480 F.2d 917 (3d Cir. 1973). Its existence is usually determined by reference to the following criteria: (1) the length of time the name or title has been used, (2) nature and extent of popularizing and advertising the name and (3) the efforts made in promoting the consciousness of the public in connecting the name or title with a particular product or literary work. *Dunhill v. Kasser,* supra, 350 F.Supp. at 1359; 3 *Callmann, Unfair Competition, Trademarks and Monopolies,* § 77.-3, p. 349 (3d ed. 1969).

■ Having considered those factors, I conclude that "Land of the Lost" does not now have a secondary meaning. It is entirely possible that this title did have such significance between 1943 and 1950, but that significance has been lost for one simple reason: by the time this suit was filed, 24 years had elapsed since the last commercial use of the title by Mrs. Kirkland. The name is no longer primarily associated by the public with the plaintiff—not even by that portion of the public which was alive at the time of her radio show. Despite plaintiff's contention that some parents of the children now exposed to the TV show possibly possess subconscious recognition of plaintiff and her radio show, she has failed to introduce any evidence or material fact to sustain such a claim.

## B. *Likelihood of Confusion*

■ Were I to find that secondary meaning did exist, plaintiff must still clear a second hurdle, i. e., defendant's use of the title has or will result in confusion of the public as to the source of the work. *Dunhill v. Kasser,* supra, 350 F.Supp. at 1360. It is not necessary that there be actual confusion by the public, but the mere possibility that a consumer may be misled is not enough; there must just be a likelihood of confusion. *Surgical Supply Service, Inc. v. Adler,* 321 F.2d 536, 539 (3d Cir. 1963).

The Restatement of Torts § 729 lists the following factors as those which courts generally use to determine whether a likelihood of confusion exists:

(a) the degree of similarity between the designation and the trade-mark or trade name in

 (i) appearance;

 (ii) pronunciation of the words used;

 (iii) verbal translation of the pictures or designs involved;

 (iv) suggestion; [8]

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree. of care likely to be exercised by purchasers.

These criteria have been adopted by the Third Circuit. *Sears, Roebuck & Co. v. Johnson,* 219 F.2d 590, 592 (3d Cir. 1955); *Robert Bruce, Inc. v. Sears, Roebuck & Co.,* 343 F.Supp. 1333, 1345 (E.D.Pa.1972). Having reviewed them, I conclude that there is no likelihood of confusion in this case.

 First, an analysis of the relative markets utilized by both parties demonstrates that their uses are anything but competing. Of course, competition between the names or titles is not always necessary, but the uses must be more than unrelated, noncompeting and dissimilar. *Dunhill v. Kasser,* supra, 350 F.Supp. at 1362–63. The uncontestable fact is that plaintiff has not used this title commercially for 25 years,[9] and the market exposed to her use has changed considerably. Those children who listened to the radio show, participated in clubs, and read the comic books are now at least thirty years of age. They are not likely to be exposed to defendant's television show, since the program is designed to reach children between the ages of six and 13.[10] Moreover, the Nielson Television Index, taken for the period September, 1974 to February, 1975, indicated that less than two percent of the United States population watching an average episode of defendant's show were even alive in 1950,[11] the last year of commercial use by the plaintiff and two years after the last year of the radio program. Realistically speaking, it is not very likely that those young children watching the television show are doing so because they equate that show with the comic books and radio show of Mrs. Kirkland. Once again, I reject plaintiff's argument concerning the possible subconscious recollections of the parents of these children, and hold that insufficient facts have been presented to create any issue as to possible confusion on this basis.

Second, whether the prospective purchasers mentioned in section 729(d) of the Restatement are the television networks and advertisers, as asserted by defendant, or is the public, as contended by plaintiff, both agree that the key question is one of harm, and whether such purchasers need protection. Should I agree with plaintiff and hold that the public is the proper area to protect, there is no question that the possibility of harm to the public does not now exist. If television watchers tune into defendant's program because they remember plaintiff's program and discover upon viewing that the program is different, they may, as defendant suggests, simply turn off the set. They have not been harmed, unless one construes the minutes lost as damaging. Because of the facts in this case, this factor is unimportant in determining a likelihood of confusion.[12]

---

**8.** There can be no dispute that there is a one hundred percent similarity between plaintiff's title and defendant's title, and for this reason, discussion on this subsection is not necessary.

**9.** Although plaintiff contends to the contrary, her alleged uses do not satisfy the requirement of commercial use. See discussion *infra.*

**10.** See Affidavit of Marty Krofft, paragraph 5.

**11.** See Affidavit of J. Marshall Wellborn, paragraph 4, dated November 20, 1975.

**12.** Of course, this situation could change. For instance, if NBC or the Kroffts began marketing products for children, such as T-shirts, games, etc., based on their show, then more of an argument could be made that the potential for harm existed. However, because I find that there could be no confusion due to the vastly dissimilar markets exposed to each party's use and because of the evidence of abandonment discussed *infra,* such a possibility of additional products resulting from defendant's television show could still be considered unimportant.

Finally, an examination of the actor's intent must be made. As Judge Becker noted in *Robert Bruce, Inc. v. Sears, Roebuck & Co.,* supra, 343 F.Supp. at 1349, intent should not be viewed in the abstract, but must be balanced with the other factors of the case. He also held, however, that if the mark or name is adopted in good faith, in reliance upon the advice of counsel, and with no intent to deceive the public and cause confusion, the defendant will be relieved from liability. 343 F.Supp. at 1342.

The facts here permit no reasonable inference but that NBC's use of this title was an act of good faith. First, it must be remembered that the name of the show was picked by the producers, with minimal participation by NBC officials, and with the advice by counsel that the title was in the public domain and available for use.[13] Second, plaintiff's contention that the one NBC official who did participate in the title discussions had knowledge of plaintiff's past use is unsupported by any factual allegation.[14] Finally, NBC prepared a licensing agreement for the program only after the title search had been completed by the producers.

Based upon the facts, the depositions and affidavits presented in this case, I have found no evidence of a likelihood confusion and no intent to deceive the public or cause confusion. Accordingly, defendant's motion for summary judgment must be granted on this ground.

### III. *Abandonment*

Alternatively, NBC asserts that whatever rights Mrs. Kirkland might have had in the words "Land of the Lost" have been abandoned by non-use. Conceding for the purpose of argument that a secondary meaning developed during plaintiff's use of the title, defendant argues that the issue becomes how long this court will permit plaintiff to claim successfully rights in words which she has not used for a prolonged period. It is obvious that these rights cannot exist indefinitely, or else a monopoly on words is created.

In general, non-use must be accompanied by some evidence of intent to abandon in order for courts to find abandonment. *Simmons v. Cantor,* 57 F.Supp. 992, 996 (W.D.Pa.1944); *Bisceglia Bros. Corp. v. Fruit Industries, Ltd.,* 20 F.Supp. 564, 568 (E.D.Pa.1937). Arguing that there was no non-use, plaintiff points to her continued efforts to promote[15] and sell her program to NBC. But these efforts fall far short of use. During the 23 year period from 1950 to 1973, not one enterprise was undertaken by Mrs. Kirkland that could be construed as a commercial exploitation of the material contained in her "Land of the Lost" program. These efforts were not

---

13. See Affidavit of Marty Krofft, paragraph 9.

14. Plaintiff, in 1969, attempted to sell her program to NBC by contacting George Barimo. She contends that because George Barimo knew Joe Taritero, the NBC official who participated with the Krofft's in selecting the title, there is a factual issue as to whether Barimo told Taritero of Mrs. Kirkland's program. However, she has not presented anything else to substantiate this claim and Mr. Taritero has denied that he was aware of plaintiff's use until after the title was selected (Deposition of Joseph Taritero, pp. 47–48).

Plaintiff's other argument, that references to her program were made on KYW, NBC's affiliate in Philadelphia, on two separate occasions, and thus made NBC aware of the existence of her use, must be rejected on similar grounds. Plaintiff has advanced neither authority nor facts from which I can find that the content of

broadcasts from one affiliated TV station can be imputed to the knowledge of NBC, let alone the one official participating in the selection. KYW airs certain network programs offered by NBC, but the local programs produced by KYW are created without the knowledge or approval of NBC. (See Affidavit of J. Marshall Wellborn, dated December 23, 1975). Mr. Taritero has denied knowledge of the existence of Mrs. Kirkland or her program prior to selection of the title and plaintiff has not attempted to refute this.

15. This includes an interview in the Philadelphia Inquirer on August 2, 1973, a feature article mentioning her program in the Evening Journal of Wilmington, Delaware, on August 7, 1969, and the interview over KYW broadcast on January 29, 1973, which was rebroadcast on August 4, 1974.

"valid public uses" [16] and even if they were, they do not constitute the continuing activity necessary to preserve whatever rights she may have possessed in the title.

 Addressing the question of intent, plaintiff argues that her continued efforts to sell the program demonstrate that she never intended to abandon the title. Yet she has only alleged one real effort, that in 1969. For the period from 1950 to 1969, no other effort to effect a sale is advanced. Mrs. Kirkland has denied that she intended to abandon, but is this enough? If it were, then abandonment could never be found, for all one would have to do would be to swear to the absence of intent. See *Golenpaul v. Rosett,* 174 Misc. 114, 18 N.Y.S.2d 889 (1940). A subjective intent to reengage in a former enterprise is not enough to avoid abandonment, "where an objective analysis of the situation furnishes ample evidence to warrant the inference of abandonment." *American Photographic Publishing Co. v. Ziff-Davis Publishing Co.,* 135 F.2d 569, 573 (7th Cir. 1943); *Uncas Manufacturing Co. v. Clark & Coombs Co.,* 200 F.Supp. 831, 835 (D.R.I.), aff'd 309 F.2d 818 (1st Cir. 1962). Moreover, our courts have held that an intent to abandon can be proved, in part, by a lack of continued use. *Browning King Co. of New York v. Browning King Co.,* 176 F.2d 105, 106–7 (3d Cir. 1949), *Manz v. Philadelphia Brewing Co.,* 37 F.Supp. 79 (E.D.Pa.1940).

 In my opinion, plaintiff has abandoned her rights in the title. She has not published a comic book, broadcast a radio show, formed a children's club, issued a record album, licensed a motion picture, or exploited her "Land of the Lost" theme for more than 20 years. Her hope of using this title one day in the indefinite future is not sufficient to prevent others from using it now.

**16.** See Plaintiff's Brief at page 7.

**17.** I need not decide defendant's other asserted basis for summary judgment, that of collateral estoppel arising out of prior litigation involving this matter. In *Hewson v. American Broadcasting—Paramount Theaters, Inc.,* New York

### IV. Conclusion

Plaintiff has not established that there is a genuine factual dispute at issue with regard to the existence of a secondary meaning or the likelihood of confusion by the public. In addition, her extended non-use has resulted in a loss of rights to the title. Accordingly, summary judgment must be entered against her.[17]

Supreme Court, Trial Term Part III, issued November 29, 1955, plaintiff, then Isabel Manning Hewson, brought a similar action, claiming a violation of her rights in the title "Lucky 7," the name of a contest which was an integral part of her radio program.