William A. CLARKE, Plaintiff,

v.

K–MART, Placo Products Company, Toy World, Joseph Dahlkemper, Inc., Toys-R-Us, J. C. Penney Co., Inc., Defendants.

Civ. A. No. 77–143 ERIE.

United States District Court,
W. D. Pennsylvania.

Aug. 3, 1979.

---

Ralph Hammer, Erie, Pa., for plaintiff.

James K. McNamara, Erie, Pa., Warren L. Kern, Los Angeles, Cal., for defendants.

## OPINION

WEBER, Chief Judge.

The plaintiff has sued the defendants for infringement of his registered trademark "SAFE–T–BALL" (1,049,699) and his patented game ball (4,029,316). He also contends that the defendants' actions which violate federal patent and trademark laws amount to a cause of action under the common law of unfair competition. The defendants have filed a motion for summary judgment on the plaintiff's claim for trademark infringement, and the related charge of unfair competition, on the grounds that the plaintiff's mark SAFE–T–BALL is descriptive of characteristics of the plaintiff's game and that the adequate record now before the Court indicates that the plaintiff's mark has not achieved a secondary meaning in the market place. Our review of the evidence indicates that no material issues of fact remain for trial on the questions of descriptiveness and secondary meaning, that these questions can be determined on the present record, and that the trademark claims are accordingly susceptible to disposition by summary judgment in favor of the defendants, see 6 pt. 2 Moore's Federal Practice ¶ 56.17[66] at p. 56–1094 (1976).

■ Even though registered with the trademark office, a product name is invalid as a trademark if it describes to potential customers the characteristics, functions, qualities, ingredients, properties or uses of the product, *Flexitized, Inc. v. National Flexitized Corp.*, 335 F.2d 774, 779 (2d Cir. 1964), *Q–Tips, Inc. v. Johnson & Johnson*, 206 F.2d 144 (3d Cir. 1953) *and if the product name has not acquired a "secondary meaning" such that the consuming public interprets the name to represent a product's origin, *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir. 1978). See generally, 3 Callman, *Unfair Competition, Monopolies and Trademarks*, § 77.1 at 336 (3d ed. 1969).

■ The first issue is whether the phrase "SAFE–T–BALL" describes characteristics, functions, properties or features of the plaintiff's game. At the outset, we note that the phonetic spelling used by both plaintiff and defendant instills no special protection when the underlying words, spelled correctly, are descriptive of the game, *see Armstrong Paint & Varnish Works v. Nu-Enamel Corp.*, 305 U.S. 315, 328–29, 59 S.Ct. 191, 83 L.Ed. 195 (1938) ("NU–ENAMEL" treated as equivalent of "new enamel" and held descriptive of the paint); Restatement of Torts § 725, Comment A, at p. 586 (1938) (. . . 'Stabrite,' 'Keep Kleen' and 'Notaseme' cannot be trademarks if 'Stay Bright,' 'Keep Clean' and 'Not a Seam' cannot be trademarks for the same goods respectively.")

■ In evaluating whether the product name SAFE–T–BALL is descriptive, other cases provide at best a rough guide and we must focus on the commonly accepted dictionary meanings of the word "safety" and "ball" and the apparent characteristics, functions, and features of the plaintiff's game. *See Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.*, 395 F.2d 457, 461 (3d Cir. 1968). Both the plaintiff's and the defendants' games are named "SAFE–T–BALL" and consist principally of velcro-covered plastic balls approximating a golf ball in size and a cloth on which a target is printed, suitable for wall hanging. The object of both games is to throw the ball against the cloth as close as possible to its center and thus attain higher point values than those which result from poorly aimed balls landing on the outer edges of the cloth. Due to their velcro covering, the balls will stick to the cloth upon impact.

The overwhelming feature of the plaintiff's game, apparent to the Court as an average lay observer is its safety, namely, that it allows children, through the use of velcro-covered balls, to enjoy safely the challenges of a conventional dart game without exposing their families and friends to the dangers of steel-pointed darts. Thus, according to the commonly accepted, dictionary definitions of the words "safety" and "ball", we believe that the phrase "SAFE–T–BALL" is descriptive of an important characteristic of the plaintiff's game. *Compare Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80–81 (7th Cir. 1977) ("Lite Beer" describes beer of a texture lighter than standard beer) *and Ralston Purina Co. v. Thomas J. Lipton, Inc.* 341 F.Supp. 129 (S.D.N.Y.1972) (applied to cat food, "Tender Vittles" described food which is soft, juicy, and easily chewed) *with Louis Rich v. Longacre*, 423 F.Supp. 1327 (E.D.Pa.1977) ("Gobble gobble" not commonly descriptive of turkey products).

Analysis of the evidence of record reinforces this conclusion. First, at a deposition in a related case, the plaintiff testified that he selected the name "SAFE–T–BALL" to describe a ball target game which is safe for children. Second, the deposition testimony of an experienced toy dealer indicates that toy manufacturers commonly used the adjective "safety" and "safe" to emphasize that their particular games are safe for children's use, (Affidavit of Armand Glenn, ¶¶ 4, 8, September 13, 1978). Finally, the printing on the boxes used by plaintiff and defendants to market their games emphasizes that the ball games are safe for chil-

dren. *See also, In re Alvah Bushnell Co.*, 49 App.D.C. 133, 261 F. 1013 (1919) (as applied to envelopes, wallets and letter files, the name "SAFE–T–SEAL" is ineligible for trademark protection because it described products as safe); *Application of B. F. Goodrich*, 52 App.D.C. 261, 262–63, 285 F. 995, 996–97 (1922). ("SAFETY" applied to automobile tires conveys impression that "tire might be used with approximate safety—that it would not skid or do any other thing that might cause injury . . ." and thus is descriptive and not subject to trademark protection).

■ Having found "SAFE–T–BALL" descriptive of a principal quality of the plaintiff's product, we turn to the issue of whether "SAFE–T–BALL" has acquired secondary meaning in the market place. Secondary meaning exists when the consuming public interprets the product name "not only [as] an identification of the product, but also [as] a representation of the product's origin," *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1228. Stated differently, to establish secondary meaning, the plaintiff must "show that the primary significance of the term in the minds of the consuming public is not the product but the producer," *Kellogg Co. v. Nat. Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938).

■ Although secondary meaning is "usually established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark" which suggests to consumers that they come from a single source, *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d at 1228, other factors include: the length and manner of use of the product, *Kirkland v. National Broadcasting Co.*, 425 F.Supp. 1111, 1115 (E.D.Pa.1976); the amount of sales of the product, *Ralston Purina Co. v. Thomas J. Lipton*, 341 F.Supp. 134–35; the product's relative popularity as evidence by empirical market studies, *id.*; and whether only the

plaintiff used the particular words comprising the trademark or whether others have used the words before in a descriptive sense, *Roselux Chemical Co. v. Parsons Ammonia Co., Inc.*, 299 F.2d 855, 49 CCPA 931 (1962); *Hamm v. Knocke*, 374 F.Supp. 1183 (E.D.Cal.1973).

■ The evidence of advertising and sales of the plaintiff's game is grossly insufficient to permit a finding of secondary meaning. Excluding a leaflet which the plaintiff's assignee distributed to toy buyers, there is no evidence that "SAFE–T–BALL" was advertised through radio, television, newspapers, magazines or other media commonly used to advertise new toys. On the basis of invoices obtained from the plaintiff the defendants indicate that sales of the plaintiff's "SAFE–T–BALL" game amounted to slightly more than $20,000 in 1975–1976 and to slightly less than $10,000 in 1977–1978. Even if the advertising and sales of plaintiff's game was far greater, it would still fall short of adequate proof of secondary meaning, *see, e. g., Hamm v. Knocke*, 374 F.Supp. at 1188 ($15,000 in advertising insufficient to infer that public associated plaintiff's mark only with him); *Sears Roebuck & Co. v. Johnson*, 219 F.2d 590, 591–92 (3rd Cir. 1955) (secondary meaning achieved by "Allstate" trade name which Sears applied to over 4000 automotive accessories, nationally marketed with millions of dollars of advertising resulting in sales of over $17 million in the Philadelphia area alone from 1946–1952, as well as to automobile insurance policies yielding millions of dollars of premiums annually).

Instead of refuting the defendants' sales and advertising information with other evidence as required by Fed.R.Civ.P. 56(e), the plaintiff makes the bald allegation that the defendants' figures are incomplete and suggests that other sales information is in the hands of its assignee. Overlooking the fact that the plaintiff could have obtained such information through Fed.R.Civ.P. 31(a) and assuming that the plaintiff's invoices do not reflect all sales of the "SAFE–T–BALL"

game by the plaintiff, the advertising and amount and time duration of sales is so grossly insufficient compared to that required by the courts to justify findings of secondary meaning that even relatively substantial additions to the defendants' figures would not alter our conclusion that no secondary meaning has been established. The lack of advertising and extensive sales over a significant period of time is our first reason for holding that the evidence has not established secondary meaning.

Of special pertinence in this case is whether only the plaintiff used the "SAFE-TY ____" and "SAFE–T– ____" designations or whether others have used such designations so widely that purchasers do not rely on such descriptive terms as an indication of origin. In *Roselux Chem. Co. v. Parsons Ammonia Co., Inc.*, 299 F.2d 855, for example, the court held that the descriptive term "sudsy" was not registrable as a trademark because it had not acquired a secondary meaning and because others used the term widely on similar products:

> As of the time when registration is being sought, others are, or in the immediate past were, using the term descriptively on the same or closely similar products, precluding the possibility that . . . ["sudsy"] could indicate any origin only in Parsons (the registrant). The word "sudsy" started as a type designation and . . . is still primarily such a word. 299 F.2d at 863.

The evidence of record in the case at bar indicates that the "SAFETY ____" and "SAFE–T– ____" designations have been used widely in the toy industry both by defendant Placo Products and third parties far before the plaintiff's games were marketed. Since 1964, Placo Products has used such designations on its products; examples include: ˙ Exclusive Placo Safety, Safety Dart Game, Safety Catch, Safety Dart Gun, Safety Target Set, Safety Throw Darts, Safety Gun Darts and Safety Vel-Darts. (Affidavit of Bernard J. Cagan, ¶ 5, filed Sept. 18, 1978). Other manufacturers have

commonly used the "safety" designations on toy packages and ads, (Affidavit of Armand Glenn, ¶¶ 4–11 filed Sept. 18, 1978) (citing the following uses: Safety Cork, Safety Pop N'Pistol, Safety Cap Rifle, Safe-T-Foam, Safe-T-Saw and Safe-T-Play).

This evidence of widespread use on toys before the plaintiff's game of the common descriptive word "safety" strongly indicates to the court that the plaintiff's use of the word has not lead the public to attribute to him games manufactured and sold by the defendants bearing the same word. *See also, Hamm v. Knocke*, 374 F.Supp. at 1187–88 (extensive prior use by others of "DROWNPROOF" precludes secondary meaning in plaintiff's favor). The word "safety" is such a highly descriptive term in our language and the defendants and other sellers and manufacturers have applied the term so indiscriminately to several kinds of toys that we consider this extensive prior use to be a separate ground, apart from the lack of advertising and extensive sales, for our holding that "SAFE–T–BALL" has not attained any secondary meaning.

In sum, because "SAFE–T–BALL" is descriptive of the plaintiff's game and because the evidence indicates that "SAFE–T–BALL" has not achieved secondary meaning, the defendants' motion for summary judgment on issue of the validity of the plaintiff's registered trademark is GRANTED.

 The plaintiff makes a separate claim for unfair competition concerning the use by the defendants of the mark "SAFE–T–BALL," and on this claim the defendants have moved for summary judgment. A prima facie case of unfair competition has two elements: (1) secondary meaning and (2) the likelihood of confusion. *See Kirkland v. National Broadcasting Co.*, 425 F.Supp. at 1115. We grant the defendants' motion for summary judgment on the unfair competition claim because the evidence adduced does not indicate that the plaintiff's mark has achieved any secondary meaning.