METRO TRAFFIC CONTROL,
INC., Appellant,

v.

SHADOW NETWORK INC., and Citi
Traffic Corp., Appellees.

No. 96–1153.

United States Court of Appeals,
Federal Circuit.

Jan. 7, 1997.

Rehearing Denied Feb. 5, 1997.

Roberta Jacobs–Meadway, Panitch Schwarze Jacobs & Nadel, P.C., Philadelphia, PA, argued for appellant. With her on the brief was Karol A. Kepchar.

Arthur Makadon, Ballard Spahr Andrews & Ingersoll, Philadelphia, PA, argued for appellees. With him on the brief were Jamie B. Bischoff, and Robert R. Baron, Jr. Of counsel was Diane Elizabeth Brehm.

Before PLAGER, RADER, and BRYSON, Circuit Judges.

RADER, Circuit Judge.

Metro Traffic Control, Inc. (Metro Traffic) appeals the August 25, 1996, decision of the Trademark Trial and Appeal Board (the Board) denying Metro Traffic's petition to cancel Citi Traffic Corporation's (Citi Traffic) service mark Registration No. 1,363,743 for "SHADOW TRAFFIC." Metro Traffic seeks cancellation due to Metro Traffic's alleged prior use of the registered mark and Citi Traffic's alleged fraud in the procurement of its registration. Because the Board based its decision on a clearly erroneous factual finding, this court vacates and remands.

**BACKGROUND**

The factual background in this case is as congested as the streets of New York or Philadelphia during rush hour. This court, therefore, profits from the Board's guidance in navigating through the factual snarls and tangles.

The story begins in Philadelphia in 1976, when Michael Lenet founded a radio and television traffic reporting business. Mr. Lenet incorporated his traffic reporting business as Shadow Network, Inc., a Pennsylvania corporation (SNI–PA). SNI–PA used the "SHADOW TRAFFIC" mark to identify its traffic reporting services throughout the Philadelphia area.

In 1979, Mr. Lenet and Mark Goldman, the head of a New York media marketing company, embarked on a joint venture to establish a "SHADOW TRAFFIC" traffic reporting service in the New York area. The venture was incorporated in New Jersey as Shadow Network, Inc. (SNI–NJ). Although SNI–PA and SNI–NJ were separate corporate entities, the two companies cooperated on advertising and other aspects of their respective businesses. For example, the two companies shared employees, shared advertising accounts, and exchanged traffic information in overlapping geographic areas.

In January 1981, a rift arose between Mr. Lenet and Mr. Goldman and the two decided to separate. Mr. Lenet took control of SNI–PA and the "SHADOW TRAFFIC" operations in Philadelphia. Mr. Goldman took control of SNI–NJ and the "SHADOW TRAFFIC" operations in New York. Even after the split, however, SNI–PA and SNI–NJ continued to cooperate in soliciting advertising.

In October 1984, Rand Communications Corporation (Rand) purchased SNI–PA. Rand reorganized SNI–PA's traffic reporting business in Pennsylvania as Shadow Traffic Network, Inc. (STNI). STNI continued to use the "SHADOW TRAFFIC" mark to identify its services in Philadelphia as SNI–PA had done before it.

On January 14, 1985, SNI–NJ filed an application with the United States Patent and Trademark Office (PTO) for registration of the "SHADOW TRAFFIC" mark. In its application, SNI–NJ filed a declaration of one of its officers indicating that SNI–NJ was the owner of the "SHADOW TRAFFIC" mark. The declaration also stated that SNI–NJ had first used the mark on December 3, 1979, and that since that time it had been the "substantially exclusive" user of the mark. The application made no mention of SNI–PA's or STNI's use of the mark in Philadelphia dating back to 1976. On October 1, 1985, the PTO issued Registration No. 1,363,743 to SNI–NJ for "SHADOW TRAFFIC" for use in connection with "radio broadcasting of traffic and transit information."

In December 1986, several owners and directors of STNI formed Shadow Traffic Network, a New Jersey partnership (STNNJ), for the purpose of buying the assets and New York area traffic reporting business of SNI–NJ. STNNJ purchased all the assets of

SNI–NJ, including Registration No. 1,363,-743, on December 10, 1986.

STNNJ financed its acquisition of SNI–NJ, in part, through a bank loan from First Pennsylvania Bank. As security for the bank loan, the investors pledged certain collateral, including the assets of STNNJ. These assets comprised the tangible and intangible assets of the newly-acquired SNI–NJ, including the registered service mark "SHADOW TRAFFIC." Some of the investors in STNNJ also guaranteed their indebtedness by pledging their stock in STNI. Although a party to the transaction, STNI pledged none of its assets to secure the loan.

In 1990, STNNJ defaulted on its bank loan. In January 1990, First Pennsylvania Bank sold that part of the pledged collateral that had previously comprised SNI–NJ to Citi Traffic. The sale of SNI–NJ's assets to Citi Traffic included service mark Registration No. 1,363,743. The sale to Citi Traffic, however, did not include the pledged STNI stock. Instead, Mr. Allan Kalish purchased this stock in March 1990.

In September 1991, Metro Traffic purchased the Philadelphia assets and traffic reporting business of STNI. On its face, the purchase included all of STNI's common law service mark rights in the "SHADOW TRAFFIC" mark. Since that time, Metro Traffic has continued to use the "SHADOW TRAFFIC" mark to identify its services in Philadelphia, just as SNI–PA and STNI had done before it.

The present dispute arises from Metro Traffic's petition to cancel Citi Traffic's service mark Registration No. 1,363,743. That petition, originally filed by STNI on October 1, 1990, alleges that Metro Traffic had senior common law rights in the name "SHADOW TRAFFIC" arising from SNI–PA's first use of the name in Philadelphia in 1976. The petition also alleges that Citi Traffic's predecessor-in-interest fraudulently procured Registration No. 1,363,743 by intentionally concealing the fact that SNI–PA used the "SHADOW TRAFFIC" mark in Philadelphia as early as 1976.

The Board conducted a trial on the issues of priority of use, fraud in the procurement, and several defenses alleged by Citi Traffic, including laches, waiver, acquiescence, estoppel, licensee estoppel, unclean hands, *in pari delicto,* and bad faith. After trial, the Board concluded that Metro Traffic had established a prior and continuous use of the mark "SHADOW TRAFFIC" in the Philadelphia area, as well as likelihood of confusion with Citi Traffic's claimed use. Nonetheless, the Board determined that Metro Traffic still could not prevail on the priority issue because whatever common law rights it had established in "SHADOW TRAFFIC" were forfeited when the First Pennsylvania Bank foreclosed on the loan collateral. According to the Board:

> Petitioner nonetheless cannot prevail here because it does not have priority. . . . [A]lthough petitioner may have continued to use the mark throughout the relevant period, whatever prior rights it had were relinquished following the 1990 default on the loan used for the purchase of SNI–NJ. As the security for that loan, the registration (and the registered mark) became the bank's property and was subsequently sold to respondent with petitioner's consent and waiver of any claim of defense it may have had in connection with the sale. Once petitioner ceased to own the registration, (and the registered mark), petitioner ceased having any claim to priority based on SNI–PA's first use in 1976, which was the basis for obtaining registration in the first place.

The Board then proceeded to address the fraud issue, concluding that Metro Traffic had not carried its burden of proof on that issue either. Weighing the testimony of witnesses before it, the Board concluded that any misstatements of fact made by SNI–NJ's declarant in the 1985 application were innocent and justifiable in light of the complex interrelationship between SNI–NJ and SNI–PA. The Board concluded that Metro Traffic had failed to prove by clear and convincing evidence that SNI–NJ had knowingly made false statements of fact with the intention of procuring a service mark registration. Metro Traffic filed this appeal.

## DISCUSSION

### *Priority of Use*

■ A person may petition to cancel a registered service mark on the basis of a prior use of the mark by someone other than the registrant. 15 U.S.C. §§ 1052(d), 1064 (1994); *West Fla. Seafood, Inc. v. Jet Restaurants, Inc.,* 31 F.3d 1122, 1124–25, 31 USPQ2d 1660, 1662–63 (Fed.Cir.1994). The petitioner shows prior use with evidence that the registered mark "so resembles . . . a mark or trade name previously used in the United States by another and not abandoned, as to be likely . . . to cause confusion." 15 U.S.C. § 1052(d). A petitioner seeking cancellation on these grounds bears the burden of proving the alleged prior use by a preponderance of the evidence. *West Fla. Seafood,* 31 F.3d at 1125.

■ This court reviews factual findings underlying the Board's priority determination for clear error. *Id.* This court rejects a factual finding as clearly erroneous only when its review of the entire body of evidence leaves the firm conviction that a mistake has been made. *Inwood Lab., Inc. v. Ives Lab., Inc.,* 456 U.S. 844, 855, 102 S.Ct. 2182, 2189, 72 L.Ed.2d 606 (1982); *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541–42, 92 L.Ed. 746 (1948). In this case, this court reaches that firm conviction with respect to the Board's finding that Metro Traffic did not show priority of use.

■ The Board correctly found that, regardless of the complex corporate interrelations among Metro Traffic and Citi Traffic and their various predecessors-in-interest, SNI–PA first used the "SHADOW TRAFFIC" mark in 1976—three years before SNI–NJ's first use. Thus, Metro Traffic's predecessor-in-interest used the mark before Citi Traffic's predecessor-in-interest. Further, the Board correctly found a likelihood of confusion between Metro Traffic's and Citi Traffic's respective uses of "SHADOW TRAFFIC." In fact, the Board concluded that confusion was "so likely that it is virtually inevitable, because the parties are using the identical mark for the identical services."

With respect to these findings, this court detects no error.

However, the Board went astray when it held that Metro Traffic lost its priority because "whatever rights it had were relinquished following the 1990 default on the loan used for the purchase of SNI–NJ." The Board clearly erred in finding that "STNI defaulted on the loan," thereby surrendering to the bank its common law rights in the name "SHADOW TRAFFIC" in the Philadelphia area.

The Board failed to recognize that STNI and STNNJ were separate entities. STNNJ, not STNI, entered into the loan and collateral agreement with the bank. Thus, STNNJ, not STNI, defaulted on the loan. STNI was the successor to SNI–PA which originally used the "SHADOW TRAFFIC" mark in 1976. STNI, as a distinct corporate entity, never pledged its assets (including any common law rights in the mark) to the bank. Thus, STNI did not forfeit its assets to the bank.

It is true that some of STNNJ's owners pledged their STNI *stock* (as opposed to STNI's underlying assets) to secure their indebtedness on the loan. This stock was eventually forfeited to the bank, but the record shows that the bank segregated the forfeited STNI stock from the forfeited assets of STNNJ. In fact, the STNI stock was sold separately from the assets of STNNJ, and eventually became the property of Metro Traffic's predecessor-in-interest. Thus, throughout the entire loan transaction, STNI remained a separate legal entity from STNNJ.

For these reasons, this court vacates the Board's decision on priority of use. Because STNI and its assets remained separate from STNNJ throughout the asset forfeiture, Citi Traffic did not acquire STNI's common law rights in the "SHADOW TRAFFIC" mark when it acquired STNNJ's assets from First Pennsylvania Bank in 1990. Even the forfeited STNI stock, which did not include rights to the service mark, did not go to Citi Traffic, but to Metro Traffic's predecessor-in-interest. Thus, neither First Pennsylvania Bank nor Citi Traffic acquired STNI's rights in the mark.

This court's reversal of the Board's decision on priority, however, does not automatically entitle Metro Traffic to cancellation. Rather, this court remands to the Board for consideration of whether STNI and STNNJ, although formally separate entities, were operated in such as way that they appeared to the consuming public as one entity. *See West Fla. Seafood,* 31 F.3d at 1126–27 (recognizing that separate corporate, business and personal entities that operate as a single entity in the eyes of the consuming public may be treated as such for trademark purposes).

Without deciding the issue, this court notes that the record discloses a close relationship between STNI and STNNJ. These facts may be relevant to whether STNI and STNNJ held themselves out to the public as a single operation and whether STNI's prior common law rights in the name "SHADOW TRAFFIC" merged into STNNJ's Registration No. 1,363,743 during that period of joint operation and control.

On a related note, this remand will also permit the Board to consider Citi Traffic's assignor estoppel theory, which is distinguishable from Citi Traffic's other equitable defenses, all of which relate to Metro Traffic's delay in seeking cancellation. According to that theory, STNNJ's assignment of Registration No. 1,363,743 to First Pennsylvania Bank estops STNI, as STNNJ's alter ego, from contesting the validity of the assigned registration in this proceeding. *See generally* 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.04[2] (1996). *See Intel Corp. v. United States Int'l Trade Comm'n,* 946 F.2d 821, 836–39, 20 USPQ2d 1161, 1175–77 (Fed.Cir. 1991); *Diamond Scientific Co. v. Ambico, Inc.,* 848 F.2d 1220, 1224–25, 6 USPQ2d 2028, 2030–31 (Fed.Cir.1988).

### Inequitable Conduct

■ A third party may petition to cancel a registered service mark on the grounds that the registration was obtained fraudulently. 15 U.S.C. § 1064(3); *Torres v. Cantine Torresella S.r.l.,* 808 F.2d 46, 47–48, 1 USPQ2d 1483, 1483–84 (Fed.Cir.1986). Fraud in procuring a service mark occurs when an applicant knowingly makes false, material representations of fact in connection with an application. *Id.* " '[T]he obligation which the Lanham Act imposes on an applicant is that he will not make *knowingly* inaccurate or *knowingly* misleading statements in the verified declaration forming a part of the application for registration.' " *Id.* at 48 (quoting *Bart Schwartz Int'l Textiles Ltd. v. Federal Trade Comm'n,* 48 C.C.P.A. 933, 289 F.2d 665, 669, 129 USPQ 258, 260 (1961)). The Board has previously held a party seeking cancellation for fraudulent procurement must prove the alleged fraud by clear and convincing evidence. *Smith Int'l, Inc. v. Olin Corp.,* 209 USPQ 1033, 1044 (TTAB 1981).

■ Metro Traffic bases its allegations of fraudulent inducement on three statements by Mr. Roy Schwartz in his declaration to the PTO. Specifically, Mr. Schwartz declared (1) that SNI–NJ owned the "SHADOW TRAFFIC" mark, (2) that he knew of no other entity who had the right to use another mark that was likely to cause confusion, and (3) that the mark had become distinctive because of SNI–NJ's "substantially exclusive" use for the five years preceding the application for registration. According to Metro Traffic, all of these statements are false and Mr. Schwartz knew them to be false at the time he signed his declaration.

The Board has consistently acknowledged a distinction between a false statement and a fraudulent statement. *Id.* at 1043 ("If it can be shown that the statement was a 'false misrepresentation' occasioned by an 'honest' misunderstanding, inadvertence, negligent omission or the like rather than one made with a willful intent to deceive, fraud will not be found."); *Kemin Indus., Inc. v. Watkins Prods., Inc.,* 192 USPQ 327, 329 (TTAB 1976) ("There is, however, a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like.").

In this case, the Board determined that Mr. Schwartz's statements, though false, were not uttered with the intent to mislead

the PTO. Based on its review of the record, the Board found that the complex factual situation in this case apparently left Mr. Schwartz with an unclear understanding of the legal implications of his statement. The Board accepted Mr. Schwartz's testimony that, although he knew the history of the mark in Philadelphia, he did not intend his statements to distinguish between the Philadelphia operations and the New Jersey operations—both of which operated under the name "SHADOW TRAFFIC." Rather, he intended the registration to secure valuable rights for all "SHADOW TRAFFIC" operations. In sum, the Board found that Mr. Schwartz's misstatements did not represent a "conscious effort to obtain for his business a registration to which he knew it was not entitled." This court, deferring as it should to the Board on matters of fact, cannot say that these findings were clearly erroneous.

## COSTS

Each party shall bear its own costs.

*VACATED AND REMANDED.*