THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:
September 13, 2010

**UNITED STATES PATENT AND TRADEMARK OFFICE**
_____

**Trademark Trial and Appeal Board**
_____

M.C.I. Foods, Inc.
v.
Brady Bunte
_____

Cancellation No. 92045959
_____

Brady Bunte
v.
M.C.I. Foods, Inc.
_____

Cancellation No. 92046056
_____

Brian J. Hundertmark of Garson Claxton LLC for M.C.I. Foods, Inc.

Bruce B. Brunda of Stetina Brunda Garred & Brucker for Brady Bunte.
_____

Before Grendel, Taylor and Bergsman,
Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

M.C.I. Foods, Inc. (hereinafter "MCI") filed a petition to cancel Registration No. 3086128 for the mark CABO CHIPS, in standard character form, for "processed snack foods formed from corn, namely, chips," in Class 30.[1]  As the

---

[1] Issued April 25, 2006.  Respondent, Brady Bunte (hereinafter "Bunte"), disclaimed the exclusive right to use the word "Chips."

Cancellation No. 92045959
Cancellation No. 92046056

ground for cancellation, MCI alleged priority of use and

likelihood of confusion.  MCI pleaded ownership of the

following federally registered marks:

    1.    CABO PRIMO and design, shown below, for the

following goods:[2]

> Mexican style food products, namely,
> chimichangas, tacos, breakfast tacos,
> burritos, breakfast burritos,
> enchiladas, tostados, tortillas, corn
> tortillas, flour tortillas, tamales,
> taquitos, chalupas, taco boats, and
> flautas; gorditas, namely thick Mexican
> bread containing cooked meats and/or
> poultry, vegetables, and seasoning;
> appetizers, namely miniature hand held
> burritos, tacos, taquitos, quesadillas,
> tamales, and flautas; rice, cookies,
> pastries, coffees, candy, snacks, namely
> salsa, tortilla chips, Mexican cookies,
> and Mexican candies; bunuelos, namely
> thin tortilla pieces, deep fried with
> cinnamon and sugar; seasonings, cactus-
> flavored seasoning, spices, salsas,
> sauces, and mole sauce, in Class 30.



In addition, in the application, Bunte provided a statement that
"[t]he English translation of the phrase 'CABO CHIPS' in the mark
is 'cape,' or 'end' chips."
[2] Registration No. 2674112, issued January 14, 2003; Section 8
affidavit accepted.

2

Cancellation No. 92045959
Cancellation No. 92046056

2. LOS CABOS and design, shown below, for the following goods:[3]

> Burritos, enchiladas, tacos, taquitos, soft tacos, sold in bulk to food distributors who resell to convenience stores, schools, fast food restaurants and the food service industry, in Class 30.



3. CABO CLASSICS, in standard character form, for "burritos, enchiladas, tacos, and taquitos," in Class 30.[4]

In his answer, Bunte denied the salient allegations of the petition for cancellation. In addition, Bunte filed a separate petition to cancel MCI's registration for the mark CABO PRIMO and design on the ground of fraud. Specifically, Bunte alleged that MCI has never used the mark CABO PRIMO and design in connection with tortilla chips and that the representatives of MCI signed the application for registration with knowledge of the false representation of use "for the purpose of obtaining rights to which [MCI] was not entitled."

In its answer, MCI denied the salient allegations in Bunte's petition for cancellation.

---

[3] Registration No. 2988402, issued August 30, 2005. MCI provided a translation of LOS CABOS as "the cape."
[4] Registration No. 3088995, issued May 9, 2006.

3

Cancellation No. 92045959
Cancellation No. 92046056

The proceedings were consolidated in an order dated February 19, 2008.

## The Record

By operation of Trademark Rule 2.122, 37 CFR §2.122, the record includes the pleadings and the registration files for the marks sought to be cancelled. The record also includes the following testimony and evidence:

1. The testimony deposition of Daniel J. Southard, the President of MCI, with attached exhibits; and

2. MCI's notice of reliance on the following items:

    a. Copies of MCI's pleaded registrations showing both the current status of and current title to the registrations;

    b. Bunte's responses to MCI's requests for admission; and

    c. Bunte's responses to MCI's first set of interrogatories.

Bunte did not introduce any testimony or evidence.

## Bunte's petition to cancel the CABO PRIMO and design registration

A. Bunte's standing.

The fact that MCI brought an action against Bunte and specifically asserted its registration for CABO PRIMO and design against Bunte demonstrates Bunte's interest in cancelling that registration. *Cf. Syntex (U.S.A.) Inc. v. E.R. Squibb & Sons Inc.,* 14 USPQ2d 1879, 1880 (TTAB 1990).

4

B.      Fraud in obtaining a registration.

A party may petition to cancel a registered trademark on the ground that the "registration was obtained fraudulently."  15 U.S.C. §1064(3). "Fraud in procuring a trademark registration or renewal occurs when an applicant knowingly makes false, material representations of fact in connection with his application."  *In re Bose Corp.,* 91 USPQ2d 1938, 1939 (Fed. Cir. 2009), *quoting, Torres v. Cantine Torresella S.r.l.,* 808 F.2d 46, 48, 1 USPQ2d 1483, 1484 (Fed. Cir. 1986).  A party seeking cancellation of a trademark registration for fraudulent procurement bears a heavy burden of proof.  *W.D. Byron & Sons, Inc. v. Stein Bros. Mfg. Co.,* 377 F.2d 1001, 1004, 153 USPQ2d 749, 750 (CCPA 1967).  Indeed, "the very nature of the charge of fraud requires that it be proven 'to the hilt' with clear and convincing evidence.  There is no room for speculation, inference or surmise and, obviously, any doubt must be resolved against the charging party."  *Smith Int'l, Inc. v. Olin Corp.,* 209 USPQ 1033, 1044 (TTAB 1981); *see also Asian and Western Classics B.V. v. Selkow,* 92 USPQ2d 1478, (TTAB 2009).

The Court of Customs and Patent Appeals explained that, before the PTO, "[a]ny 'duty' owed by an applicant for trademark registration must arise out of the statutory requirements of the Lanham Act," which prohibit an applicant

from making "*knowingly* inaccurate or *knowingly* misleading statements." *Bart Schwartz Int'l Textiles, Ltd. v. Fed. Trade Comm'n*, 289 F.2d 665, 669, 129 USPQ 258, 260 (CCPA 1961) (Emphasis in the original). Therefore, the court stated that, absent the requisite intent to mislead the PTO, even a material misrepresentation would not qualify as fraud under the Lanham Act and warrant cancellation. *King Auto., Inc. v. Speedy Muffler King, Inc.*, 667 F.2d 1008, 1011 n.4, 212 USPQ 801, 803 n.4 (CCPA 1981).

The Court of Appeals for the Federal Circuit, our primary reviewing court, has noted that there is "a material legal distinction between a 'false' representation and a 'fraudulent' one, the latter involving an intent to deceive, whereas the former may be occasioned by a misunderstanding, an inadvertence, a mere negligent omission, or the like." *In re Bose Corp.,* 91 USPQ2d at 1940, *quoting, Kemin Indus., Inc. v. Watkins Prods., Inc.*, 192 USPQ 327, 329 (TTAB 1976). In other words, deception must be willful to constitute fraud. *In re Bose Corp.,* 91 USPQ2d at 1940. Thus, a trademark registration is obtained fraudulently only if the applicant knowingly makes a false, material representation with the intent to deceive the USPTO. *In re Bose Corp.,* 91 USPQ2d at 1941. In this regard, the Federal Circuit stated the following:

> Subjective intent to deceive, however
> difficult it may be to prove, is an

> indispensable element in the analysis.
> Of course, "because direct evidence of
> deceptive intent is rarely available,
> such intent can be inferred from
> indirect and circumstantial evidence.
> But such evidence must still be clear
> and convincing, and inferences drawn
> from lesser evidence cannot satisfy the
> deceptive intent requirement."
> [Internal citation omitted].  When
> drawing an inference of intent, "the
> involved conduct, viewed in light of all
> the evidence … must indicate sufficient
> culpability to require a finding of
> intent to deceive."

*In re Bose Corp.,* 91 USPQ2d at 1941.

The court framed the issue presented by a fraud claim as whether applicant's misstatements "represent 'a conscious effort to obtain for his business a registration to which he knew it was not entitled.'"  *In re Bose Corp.,* 91 USPQ2d at 1942, *quoting Metro Traffic Control, Inc. v. Shadow Network Inc.,* 104 F.3d 336, 41 USPQ2d 1369, 1373 (Fed. Cir. 1997).

> There is no fraud if a false
> misrepresentation is occasioned by an
> honest misunderstanding or inadvertence
> without a willful intent to deceive.
> [Internal citation omitted] …  Unless
> the challenger can point to evidence to
> support an inference of deceptive
> intent, it has failed to satisfy the
> clear and convincing evidence standard
> required to establish a fraud claim.

*In re Bose Corp.,* 91 USPQ2d at 1942.

C.    Relevant testimony.

Daniel Southard, MCI's President, testified that MCI has used the CABO PRIMO mark only on burritos.

7

Q.   It's my understanding that [MCI]
     has used the "Cabo Primo" mark
     referred to on the first page of
     Exhibit 10 [a copy of the CABO
     PRIMO registration file] solely in
     relation to burritos; is that
     correct?

A.   I believe - - right now the way - -
     I recall burritos, but I believe we
     might have offered some other and
     we're currently coming up with new
     other items other than burritos
     under the "Cabo Primo" trademark.

Q.   Okay, Let me refer you back to
     Exhibit 2, the responses, the
     Amended Response to
     Interrogatories, and in particular
     to Interrogatory No. 3, which says
     "Identify the goods sold or offered
     for sale under each of [MCI's]
     marks."  And the first sentence
     reads "The goods sold or offered
     for sale under the 'Cabo Primo'
     mark are burritos."  Is that
     correct?

A.   What year was that?

Q.   This was on March 7, 2008, it was
     signed.

A.   Okay.  Yes.

Q.   Are you saying that at this point
     that [MCI] has sold other products
     under the "Cabo Primo" mark other
     than burritos?

A.   I'm saying we're planning on
     introducing - - in fact, we have
     already started selling other items
     under the "Cabo Primo" brand.

Q.   Okay.  Is it true, then, as of
     March 7, 2008, when this Exhibit
     No. 2 was signed, that the only
     products that [MCI] up till (sic)
     that point sold under the "Cabo

8

> Primo" mark were burritos - - yeah,
> the "Cabo Primo?"
>
> A.   I'm about 90 percent sure that's
>      true.
>
> Q.   Okay.
>
> A.   I would have to really go back and
>      look, but I believe that's 90
>      percent true, meaning that we might
>      have tried to or put on the drawing
>      board or kicked around some other
>      items other than burritos.[5]

Nevertheless, Mr. Southard testified that although MCI has not sold any tortilla chips in connection with its CABO PRIMO mark, it has used the mark in connection with tortilla chips in sales presentations.

> Q.   Has [MCI] used the Cabo Primo and
>      design trademark in commerce on or
>      in connection with tortilla chips?
>
> A.   Yes.
>
> Q.   Has [MCI] sold tortilla chips under
>      the Cabo Primo and design
>      trademark?
>
> A.   No.[6]
>
>              *     *     *
>
> Q.   How did [MCI] use the Cabo Primo
>      and design trademark in commerce on
>      or in connection with tortilla
>      chips?
>
> A.   We would make - - when we make
>      presentations to buyers of - - or
>      current buyers or potential buyers

---

[5] Southard Dep., pp. 66-67; *but see* Southard Dep., p. 16 where Mr. Southard testified that MCI has used the mark CABO PRIMO and design on "burritos and tacos, things like that."
[6] Southard Dep., p. 16.

9

of our products or new products. When we're in the buying (sic) offices and we have a captive audience, we bring some chips and salsa and dips, provide some water. We'll spread our Cabo Primo products on the table where everybody is sitting, and we'll cook off some of our products and let customers eat the products along with some chips, rice and beans, and make a presentation like a sit-down lunch.

And during the presentation, our products are spread - - uncooked products individually wrapped bearing the Cabo Primo label are sitting on the table, and they could be sitting next to a bowl of chips; they could be sitting next to a bowl of salsa or beans. So we use the chips to compliment (sic) the product as we make our presentation and sales to customers.

Q. Okay. Just to confirm a bit there, did the potential customers to whom you are making the sales presentation see the Cabo Primo and design trademark positioned in close contact with the Mexican-style food products you were selling and with the tortilla chips?

A. Yes.[7]

\* \* \*

Q. And where was the mark (sic) "Los Cabos" or "Cabo Classics" or "Cabo Primo" in relation to the chips?

A. Well, they were affixed to our products, and our products could be sitting next to your tablet in

_____

[7] Southard Dep., pp. 17-18; *see also* Southard Dep., pp. 63-64.

> front of you, adjoining or next to
> or all over, around.

> Q.   Okay.  So the mark was affixed to
> the wrapper of the products?  Is
> that what you are saying?

> A.   That's correct.

> Q.   And the chips and salsa, rice and
> beans were also on the table as an
> accompaniment for the product?

> A.   That's correct.[8]

Mr. Southard explained that MCI sought to register CABO PRIMO and design for an expansive list of Mexican foods to obtain a broad scope of protection for the future.

> Q.   Referring to the first page of
> Exhibit 10, there's obviously a lot
> of Mexican food products listed on
> the Cabo Primo registration.  Do
> you see them?

> A.   Yes.

> Q.   And were those products put on
> there in anticipation of future use
> of the mark in relation to those
> products?

> A.   Yes.

> Q.   Okay.  So at the time this
> application was filed and at the
> time this registration was issued,
> you hadn't used the mark in
> relation to any of these products
> other than burritos; is that
> correct?

> A.   Again, I'm 90 percent sure that's
> correct.[9]

---

[8] Southard Dep., p. 64.
[9] Southard Dep., pp. 67-68; *see also* Southard Dep., pp. 65-66.

Mr. Southard testified that MCI discussed this registration strategy with counsel.

Q.    When you filed the application [for "Los Cabos" and design], did you provide anyone with a list of goods that you wanted to have on the application for Los Cabos?

A.    Yes.  It was discussed with counsel.

Q.    Okay. … what was your understanding when you provided that list?

A.    That we needed - - we wanted to provide a list that would encompass any Mexican food products that could possibly be introduced by somebody else and [be] confused with our products in the future.

Q.    And is that true with respect to the "Cabo Primo" and the "Cabo Classics" applications as well, that you had the same understanding with respect to the goods that were identified in the application?

A.    Yes.[10]

D.    MCI did not intend to deceive the USPTO.

Based on Mr. Southard's testimony, we make the following findings of fact:

1.    MCI has used its CABO PRIMO and design mark only on burritos;

2.    MCI has not used its CABO PRIMO and design mark on or in connection with tortilla chips;[11]

---

[10] Southard Dep., p. 70.

13. MCI made a false representation when it filed its application to register the CABO PRIMO and design mark and claimed use on products other than burritos; and

4. MCI did not intend to deceive the USPTO when it filed its application to register its CABO PRIMO and design mark.

Although MCI was using the CABO PRIMO and design mark only in connection with burritos, it wanted to obtain as broad a scope of protection as possible in its application, and sought the advice of counsel by providing a list of the goods it wanted to include in the application. That list of goods was "discussed with counsel." Because MCI filed its application to register the CABO PRIMO and design mark with the advice of counsel, the overly expansive description of goods, while a false statement, falls short of constituting a fraudulent statement which carries with it an actual or implied intent to deceive the USPTO. *Cf. Sands, Taylor & Wood v. Quaker Oats,* 978 F.2d 947, 24 USPQ2d 1001, 1014 (7th Cir. 1992 ("A party who acts in reasonable reliance on the advice of counsel regarding a close question of trademark law generally does not act in bad faith"); *Thomas Nelson Inc. v. Cherish Books Ltd.,* 224 USPQ 571, 573 (S.D.N.Y. 1984) (court ruled that the case was not an

---

[11] Mr. Southard's testimony regarding MCI's use of the mark CABO PRIMO and design in connection with tortilla chips was not persuasive or credible.

exceptional one warranting attorney's fees because plaintiff demonstrated that it was acting on advice of counsel); *Cuisinarts, Inc. v. Robot-Coupe Intl. Corp.,* 580 F.Supp. 634, 222 USPQ 318,322-323 (S.D.N.Y. 1984) (court declined to order an accounting for profits where defendant relied on advice of counsel); *Robert Burns, Inc. v. Sears, Roebuck & Co.,* 343 F.Supp. 1333, 174 USPQ 94,105-106 (E.D. Pa. 1972) (accounting for profits denied where defendant demonstrated that it acted in good faith upon the advice of counsel).  While MCI sought to obtain a registration covering as broad a description of goods as possible despite the fact that it was not using the mark on all the goods listed in the description of goods, there is no evidence or testimony indicating that MCI was advised that it could not or should not apply for Mexican food products not identified by its CABO PRIMO and design mark.

Under the circumstances of this case, finding particularly that MCI sought advice of counsel, we cannot conclude that MCI intended to deceive the USPTO.  That is, we will not draw an inference that MCI acted with the intent to deceive the Trademark Office without some factual basis for drawing such an inference.  In this case, it was incumbent upon Bunte to establish such a factual basis by, for example, eliciting further testimony as to the actual advice MCI received when it "discussed with counsel" the

14

list of goods it intended to include in the application and whether or to what extent MCI relied on such advice. We will not infer, against MCI, that counsel necessarily advised MCI that it was not entitled to seek registration of the mark for goods upon which the mark was not in use, and that MCI ignored that advice. Because fraud must be proven "to the hilt" with clear and convincing evidence, and any doubt must be resolved against the charging party, *Smith Int'l, Inc. v. Olin Corp.*, 209 USPQ at 1044, Bunte failed to show, by direct evidence, that MCI intended to deceive the USPTO or, by indirect evidence, that the Board could draw no reasonable conclusion other than that MCI intended to deceive the USPTO. We add that our finding here does not mean that mere assertion that one acted on "advice of counsel" will make out a good defense to a charge of fraud. Rather, our finding should be taken as an indication that the charging party must be able to show at trial that the defense is inapplicable or inappropriate under the particular circumstances of the case at hand.

In view of the foregoing, we find that MCI did not commit fraud on the USPTO in filing and prosecuting the application for its CABO PRIMO and design registration. However, because MCI has used the CABO PRIMO and design mark only in connection with burritos, we restrict the description of goods in that registration to "Mexican style

15

food products, namely, burritos, breakfast burritos, and appetizers, namely miniature hand held burritos." Section 18 of the Trademark Act of 1946, 15 U.S.C. §1068; *see also Bose Corp. v. Hexawave, Inc.,* 88 USPQ2d 1332, 1338 (TTAB 2007), *rev'd on other grounds,* 580 F.3d 1240, 91 USPQ2d 1938, 1942 (Fed. Cir. 2009).

<u>MCI's petition to cancel
the CABO CHIPS registration</u>

A.    <u>Standing</u>

Because MCI has properly made its pleaded registrations of record, MCI has established its standing to cancel respondent's registration. *Cunningham v. Laser Golf Corp.,* 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982).

B.    <u>Priority</u>

Where both MCI and Bunte are owners of registrations, MCI must prove priority of use. *Brewski Beer Co. v. Brewski Brothers Inc.,* 47 USPQ2d 1281, 1284 (TTAB 1998); *Henry Siegel Co. v. M & R Mfg. Co.,* 4 USPQ2d 1154, 1160 n.9 (TTAB 1987); *American Standard Inc. v. AQM Corp.,* 208 USPQ 840, 841-842 (TTAB 1980); *SCOA Industries Inc. v. Kennedy & Cohen, Inc.,* 188 USPQ 411, 413 (TTAB 1975). Priority is always an issue in a cancellation proceeding because both parties are entitled to the presumptions accorded a

registration under Section 7(c) of the Trademark Act of 1946, 15 U.S.C. §1057(c).

Because Bunte failed to introduce any testimony or evidence, the earliest priority date upon which he can rely is the application filing date for his subsequently issued registration. *Brewski Beer Co. v. Brewski Brothers Inc.,* 7 USPQ2d at 1284; *American Standard Inc. v. AQM Corp.,* 208 USPQ at 842. The filing date of Bunte's application for registration is August 13, 2003.

In proving priority of use, MCI may rely, as evidence of its use of its marks, upon the filing dates of its applications for its subsequently issued registrations. *Brewski Beer Co. v. Brewski Brothers Inc.,* 47 USPQ2d at 1284; *Henry Siegel Co. v. M & R Mfg. Co.,* 4 USPQ2d at 1160 n.9; *American Standard Inc. v. AQM Corp.,* 208 USPQ at 842. MCI filed the application for the LOS CABOS and design registration on July 20, 1994; the application for the CABO PRIMO and design registration on May 29, 2001;[12] and the application for the CABO CLASSICS registration on October 23, 1997.

In view of the foregoing, MCI has priority of use in connection with all of its marks.

---

[12] In addition, Mr. Southard testified that MCI first used the CABO PRIMO and design mark in connection with burritos in commerce in 2001. (Southard Dep., p. 16). Thus, MCI has established common law priority in connection with the CABO PRIMO and design mark in connection with burritos.

C.    Likelihood of Confusion

Our determination of likelihood of confusion under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion.  *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973); *see also, In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods.  *Federated Foods, Inc. v. Fort Howard Co.,* 544 F.2d 1098, 192 USPQ 24 (CCPA 1976).

1.    The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

We turn first to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.  *In re E. I. du Pont De Nemours & Co.,* 177 USPQ at 567.  In a particular case, any one of these means of comparison may be critical in finding the marks to be similar.  *In re White Swan Ltd.,* 8 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.,* 6 USPQ2d 1041, 1042 (TTAB 1988).

MCI'S marks CABO CLASSICS, CABO PRIMO and design and LOS CABOS and design and Bunte's mark CABO CHIPS are similar

18

in sight and sound to the extent that they share the word "Cabo." Because the similarity or dissimilarity of the marks is determined based on the marks in their entireties, the analysis cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire marks, not just part of the marks. *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985); *see also Franklin Mint Corp. V. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 23, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion"). On the other hand, different features may be analyzed to determine whether the marks are similar. *Price Candy Company v. Gold Medal Candy Corporation,* 220 F.2d 759, 105 USPQ 266, 268 (CCPA 1955). In fact, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re National Data Corp.,* 224 USPQ at 751.

In this regard, there are a number of cases that reflect the principle that if a mark comprises both a word and a design, the word is normally accorded greater weight because it would be used by purchasers to request the goods

19

or services.  *See In re Appetito Provisions Co.*, 3 USPQ2d 1553, 1554 (TTAB 1987); *Kabushiki Kaisha Hattori Tokeiten v. Scuotto,* 228 USPQ 461, 462 (TTAB 1985).  We find that the word portions of MCI's marks are the dominant elements of its marks because consumers would use them to call for the products.

Not only are the word portions of the MCI marks entitled to greater weight in our analysis, but the word "Cabo" in the parties' marks is the dominant element of the marks.  The significance of "Cabo" as the dominant element of MCI'S marks CABO CLASSICS and CABO PRIMO and design and Bunte's CABO CHIPS marks is reinforced by its location as the first word of the marks.  *Presto Products Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988)("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered"); *see also Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin,* 396 F.3d 1369, 73 USPQ2d 1689, 1692 (Fed. Cir. 2005)("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992) (upon encountering the marks, consumers must first notice the identical lead word).

With respect to MCI's LOS CABOS and design mark, "Los" is Spanish for the definite article "the,"[13] and as such highlights the word "Cabos."

Finally, the word "Cabo" in Bunte's mark CABO CHIPS is clearly the dominant portion of Bunte's mark because the word "Chips" is generic for chips.

If the consumer is a Spanish speaker, then the marks have similar meanings because the word "Cabo" means "cape" and "Cabos" would be understood as the plural form of the word.[14] On the other hand, if the consumer is not a Spanish speaker, then the word "Cabo" or "Cabos" constitutes a fanciful term used in the marks. Because words in English are normally pluralized by the addition of an "s," the CABOS in MCI's mark LOS CABOS and design would be viewed as the plural of CABO, even though the non-Spanish speaker would not know the meaning of the words themselves. Likewise, we find that the marks engender similar commercial impressions because "Cabo" is a Spanish word, or a Spanish sounding word to non-Spanish speakers, used in connection with Mexican food.

---

[13] *See* the translation statement in MCI's Registration No. 2988402; Cassell's Spanish Dictionary, p. 51 (1959). The Board may take judicial notice of dictionary evidence. *University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co.,* 213 USPQ 594, 596 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).

[14] *See* the translation statement in MCI's Registration No. 2988402; the translation statement in Bunte's Registration No. 3086128; and Cassell's Spanish Dictionary, p. 156.

Bunte argues that the marks are not similar for two reasons. First, "[e]ach of the marks include (sic) the common term 'CABO' which is a geographical term that refers to a cape or end, e.g., Cabo San Lucas. MCI has not claimed or demonstrated any exclusive association of the term CABO with any Mexican food products."[15] However, there is no evidence that the word "Cabo" is a geographically descriptive term pointing to a specific location any more than the words "bay," "mountain," or "valley" are geographically descriptive terms. Furthermore, because MCI has three registrations incorporating the word "Cabo" and Mr. Southard testified that the only other user of the word "Cabo" for a food product was Bunte,[16] it was incumbent upon Bunte to prove that the word "Cabo" is commonly used in connection with food products.

Bunte also argued that MCI, in prosecuting the application that resulted in its registration for the mark LOS CABOS and design, argued that the dominant portion of that mark was the design element. While MCI may have taken a position before the examining attorney contrary to our finding, MCI's prior position does not relieve us of making our own independent finding of fact.

> That a party earlier indicated a
> contrary opinion respecting the
> conclusion in a similar proceeding

---

[15] Bunte's Brief, p. 10.
[16] Southard Dep., p. 24.

22

> involving similar marks and goods is a
> fact, and that fact may be received in
> evidence as merely illuminative of shade
> and tone in the total picture
> confronting the decision maker. To that
> limited extent, a party's earlier
> contrary opinion may be considered
> relevant and competent. Under no
> circumstances, may a party's opinion,
> earlier or current, relieve the decision
> maker of the burden of reaching his own
> ultimate conclusion on the entire
> record.

*Interstate Brands Corp. v. Celestial Seasonings, Inc.,* 576 F.2d 926, 198 USPQ 151, 154 (CCPA 1978). Thus, while we have considered that earlier argument made by MCI, we conclude, for the reasons already discussed, that LOS CABOS is the dominant element of its LOS CABOS and design mark.

In view of the foregoing, we find that Bunte's mark CABO CHIPS is similar to all three of MCI's marks in terms of appearance, sound, meaning and commercial impression.

2. <u>The similarity or dissimilarity and nature of MCI's goods and Bunte's goods as described in their respective registrations</u>.

Bunte's mark is registered for corn chips. MCI's CABO CLASSICS mark is registered for "burritos, enchiladas, taco, and taquitos"; its LOS CABOS and design mark is registered for "burritos, enchiladas, tacos, taquitos, soft tacos, sold in bulk to food distributors who resell to convenience stores, schools, fast food restaurants and the food service industry," and its CABO PRIMO and design mark, as now restricted, is registered for burritos. It is common

23

knowledge that Mexican food is served with tortilla chips. In fact, Mr. Southard testified that when his company makes sales presentations, it serves tortilla chips to accompany the lunch featuring MCI's Mexican foods.  MCI's Mexican foods and Bunte's corn chips are complementary products and when sold under similar marks, consumers are likely to mistakenly believe that they emanate from the same source.

> 3.  The similarity or dissimilarity of likely-to-continue trade channels and classes of consumers.

Because there are no restrictions in Bunte's description of goods, or in the description of goods in MCI's CABO PRIMO and design and CABO CLASSICS registrations, we must consider the goods to move in all the normal and usual channels of trade and methods of distribution to all potential purchasers, and these customers would include the general public.  *Octocom Systems, Inc. v. Houston Computers Services, Inc.,* 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990); *Canadian Imperial Bank of Commerce, N.A. v. Wells Fargo Bank,* 811 F.2d 490, 1 USPQ2d 1813, 1815 (Fed. Cir. 1987).  The identification in MCI's LOS CABOS and design registration, "sold in bulk to food distributors who resell to convenience stores, schools, fast food restaurants and the food service industry," obviously restricts the channels of trade, but because Bunte's registration is not restricted, his goods could be sold in bulk to distributors who resell to the same institutions as well.

24

Thus, we find that MCI's Mexican food products and Bunte's corn chips move in the same channels of trade and are sold to the same classes of consumers.

4. The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

Bunte's corn chips and MCI's Mexican food products identified by the CABO PRIMO and design and CABO CLASSICS and design marks are ordinary consumer products purchased by ordinary consumers. They can be purchased on impulse and without much care or deliberation. Accordingly, we find that the purchasing conditions for these products support a finding of likelihood of confusion.

With respect to MCI's LOS CABOS and design mark, the Mexican food products are "sold in bulk to food distributors who resell to convenience stores, schools, fast food restaurants and the food service industry." In its application to register LOS CABOS and design, MCI stated that its Mexican food products identified by the LOS CABOS and design mark are only seen by professional institutional buyers.[17] As indicated above, because Bunte's description of goods is not restricted to exclude bulk purchases to institutional buyers, we must presume that institutional purchasers could encounter the marks of both parties. However, the evidence regarding the degree of care exercised

---

[17] Southard Dep., Ex. 3.

by the professional institutional buyers was simply not developed in sufficient detail to permit us to draw any conclusions regarding the degree of consumer care. Accordingly, with respect to MCI's LOS CABOS and design mark, this *du Pont* factor is neutral.

5.    Balancing the factors.

After considering all evidence and arguments bearing on the *du Pont* factors, including any we have not specifically discussed here, we find that because the marks are similar and the goods, channels of trade and classes of consumers are similar, if not identical, that Bunte's mark CABO CHIPS for corn chips so resemble MCI's marks CABO PRIMO and design, LOS CABOS and design, and CABO CLASSICS all for Mexican food products as to be likely to cause confusion.

Decision:  Cancellation No. 92049959 is granted and Registration No. 3086128 will be cancelled in due course.

Cancellation No. 92040056 is dismissed, however, the identification of goods in MCI's Registration No. 2674112 is restricted to read as follows:  "Mexican style food products, namely, burritos, breakfast burritos, and appetizers, namely miniature hand held burritos."

26